[Crim. No. 14848. In Bank. Mar. 20, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
STANLEY CARL RHINEHART, Defendant and Appellant.

## COUNSEL

Edward J. Horowitz, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab and Lawrence P. Scherb, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.**—Defendant was charged by information with two counts of murder. His request to represent himself in propria persona was denied, and he pleaded not guilty to both counts. His motion to suppress certain evidence was denied, as was his motion for propria persona privilege to use the law library in the jail. After trial by a jury, defendant was found guilty of two counts of murder in the first degree. At the penalty phase, the jury fixed the penalty at death for both counts, and defendant was sentenced accordingly. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

On August 25, 1969, in the early afternoon, defendant borrowed a 1957 black Chevrolet from a friend, James Christopher Ashley. Around 1 p.m., defendant went to the apartment of another friend, George Deo, arriving in Ashley's car. Deo indicated that he had a friend who wanted to buy some marijuana. Defendant told him he might know someone who had marijuana for sale and said that he would go and see. Defendant thereupon left, having decided to buy some alfalfa and catnip from a pet shop and sell it as marijuana. Around 3 p.m., defendant returned to Deo's apartment. He had the alleged "marijuana" in two sacks. About the same time, Osborne Crump, Deo's friend who was the prospective purchaser, arrived, driving a 1967 light-colored Pontiac belonging to his fiancee, Patricia Graham. Crump had about $400 in his possession, including a $50 bill and some $20's and $10's. Crump first bought one sack of the "marijuana" for $150, and then, according to defendant's testimony, bought the other shortly thereafter for $135, paying a total of $285. The sacks supposedly containing marijuana were left at Deo's apartment.

Crump, after picking up Miss Graham at her place of employment, returned to Deo's apartment for the marijuana around 5:30 p.m. Crump and Deo lit a cigarette rolled from the substance defendant had sold as

marijuana and then realized that Crump had paid some "good money" for something that was not "good marijuana." Between 6:15 and 8 p.m., efforts were made to locate defendant, but they were unsuccessful.

According to Ashley's testimony, while he and defendant were driving north on Wilmington just about sundown, he heard a man in a 1967 Pontiac travelling on Wilmington in the same direction call out, "Rhinehart" (defendant's name). Ashley was shown a picture of Miss Graham's car, and he said that it looked like the same car. He said that there were two Negro persons in the vehicle, a male and a female. Ashley drove to 137th, made a left turn, and stopped. The 1967 Pontiac followed and pulled up behind Ashley's car. Defendant got out and went over and talked with the person on the driver's side of the Pontiac. He returned to Ashley's car and asked that Ashley drive down 137th, which dead-ends about two blocks west of where the cars had stopped. Ashley made a U-turn at the dead-end and stopped his car on the south side of 137th facing east. The Pontiac followed and stopped six or seven feet behind Ashley's car. A white Chevrolet was parked in back of where the Pontiac stopped.

Ashley further testified that defendant told him that he was getting out; that when defendant did so, there was nothing unusual about his personality, and he appeared to be entirely normal; that defendant went back toward the Pontiac; that he (Ashley) then left; and that by this time it was getting dark.

Lynn Rodgers, a 15-year-old girl residing at 1025 West 137th Street (in the block where the street dead-ends), testified that about a quarter to nine on the evening of August 25, 1969, she was preparing for bed. She was looking out of the window, and the reflection of lights on a car attracted her attention. She saw that a Pontiac had backed up in front of her house and stopped a couple of feet ahead of a white Chevrolet parked on the street. Then a black Chevrolet drove up and stopped in front of the Pontiac. There appeared to be two Negro men in the black Chevrolet; and one of them got out, walked over to the Pontiac, and opened the door on the passenger's side. Miss Rodgers walked away from the window, assuming that the person opening the door on the passenger's side of the Pontiac was getting a ride. She said the black Chevrolet had been driven off.

As Miss Rodgers walked away from the window, she heard a popping noise like firecrackers, but said there were not more than three "pops." She turned, went back to the window, and looked out. The door to the Pontiac

was wide open, and a man was standing with his back against it about an inch from the edge of the door on the left side. A girl fell from the car and started crawling to go under the white Chevrolet. The view Miss Rodgers had of the man was in profile, because he was looking inside the car. Miss Rodgers testified that the street lights were on at the time and that the man she saw was defendant.

Miss Rodgers said that the young lady who fell out of the car and started crawling under the Chevrolet was calling for help. Miss Rodgers, with her father and her brother, went to their front porch. She saw that the girl had crawled under the car and that defendant was clicking a gun, directing it toward the side of the girl's head, and saying, "There's nothing left, nothing else left in the gun" and "Baby, why don't you come out from up under there?" Defendant turned in Miss Rodgers' direction, and she had another view of his face.

According to Miss Rodgers' testimony, defendant turned and walked over to the driver's side of the Pontiac, opened the door, and said, "Move over." The person in the car did not move. It looked as though defendant pushed him over. Miss Rodgers heard a sound like the roaring of an accelerator and saw what appeared to be a human form in the automobile fall over. Defendant entered the car after the roaring of the accelerator, closed the door, and drove off.

Earl Dwayne Rodgers, Miss Rodgers' brother, testified that on August 25, 1969, he and his father were watching television and heard some shots. They jumped up to see what was happening. A girl was under a car, and defendant was nearby talking to her. While he was talking, he had a gun in his left hand; and he clicked the gun by the girl's head about three times.

Evelyn Green testified that she resided at 1016 West 137th Street. She came home on August 25, 1969, about three or four minutes before 9 p.m., driving a vehicle. As she turned towards 137th Street off of Grandee, there were two cars that came all the way down 137th Street. She drove down the street to her driveway, with the cars following behind her. She said that she paid special attention to the people in the cars, because her house had been burglarized several times. She parked her car in front of the garage and then went around and closed the garage door (which had been left open) in order to get a good look at the people who were in the car. Mrs. Green saw defendant get out of the light-colored car. She later heard some shots or loud reports and called the police. While she was talking on the telephone, three shots were fired. The only person she saw outside the car was defendant.

According to Ashley's testimony, he saw defendant again around 11 o'clock that evening at the home of a friend, and around 11:30 or 12 they went together to 91st and Western to a club where gambling occurs. At that time, Ashley saw defendant in possession of a $50 bill.

Police officers for the City of Compton sent to investigate the crime arrived shortly after 9:20 p.m. The female gunshot victim was moved by ambulance to a hospital, where she died soon after arrival. Among other things, the officers found at the scene of the crime a slip of paper bearing an address and telephone number on one side and a series of telephone numbers on the other side. Included was the number 774-2658. Upon learning that 774-2658 was George Deo's telephone number, police officers went to his residence looking for him. He was not at home, but they left word that a young woman had been murdered and that they would like to talk with him. Upon receiving the message, Deo, accompanied by Mills, went to the Compton police station. Later in the evening, Deo went to the hospital to which Miss Graham had been taken, and he identified her body.

A search was made for defendant. He was finally located at approximately 5:30 a.m. on August 26, 1969, in bed asleep at his mother's home and was told that he was under arrest for suspicion of murder and that he was to get up and dress.

Some time after 9 a.m. on August 26, 1969, the Pontiac was found at the corner of Piru and Willowbrook. Crump's body, with his clothing blood-soaked and his pants pockets turned inside-out, was lying on the front seat. A wallet, containing Crump's identification but no money, and a woman's purse were found inside the car. No money was discovered in the car, but six pennies were found in the victim's pockets.

Testimony of police officers reveals, among other things, that the distance from the curbline to the windows of the Rodgers' home is 49½ feet; that the area is well lighted with modern mercury vapor lights; that defendant's fingerprints were found on the Pontiac; and that the bullets removed from both Miss Graham's body and Crump's body were fired from the same weapon.

Arthur Camarillo, one of the officers, testified that he conducted an interview with defendant at approximately 9:30 a.m. August 26, 1969, first advising him of his constitutional rights. Defendant told the officer that at approximately 6 p.m. August 25, 1969, he went to the house of his friend, John Primer, where he met a friend by the name of James Ashley, and that John Primer's brother was there, too. Later, he borrowed Ashley's 1957 Chevrolet and went to George Deo's apartment, arriving

about 7 p.m. and staying approximately 20 minutes. He said that after leaving there he drove to a pet shop and then to a residence on 124th Street off of Wilmington Avenue, which residence was the home of Angie Sanders. There he met Ashley, Freddie May Driscoll, and the latter's husband, Donnie. He arrived at approximately 8 p.m. and remained until 9:30 p.m. After leaving, he drove to the house of his cousin, Wesley Brim, on Alondra near Center Street in Compton, and stayed there from 9:45 until 10:45. He then drove back to John Primer's, where he again met Ashley and returned his car. He stayed at Primer's house until approximately 12:30 a.m., at which time he went home and went to bed and was later arrested.

### Defense

Defendant called in his behalf a Compton police officer, who testified regarding his interviews with Miss Rodgers and Mrs. Green on the night of the killings, showing some slight discrepancies with their testimony in court.

Defendant took the stand in his own defense, denied shooting either Miss Graham or Crump, and sought to establish an alibi. He testified that on the afternoon of August 25, 1969, he had borrowed Ashley's car, intending to go to his girl friend's house and have her follow him back and then use her car to do what he was going to do. He did not go to her house, but went to George Deo's apartment, where Deo mentioned that he knew somebody who wanted to buy some marijuana. Defendant told Deo he might know somebody who had some marijuana and said he would go and see and then return. He left and got the idea to obtain some "bunk," meaning bunco. He went to a pet shop and bought some alfalfa and catnip and put it in two bags. He then returned to Deo's apartment, where Deo introduced him to Osborne Crump. Crump wanted to see the marijuana, and defendant went outside and came back with the two bags. Crump wanted to try it; so they rolled a cigarette, and all of them smoked it. Crump said that it was weak, but that it would do. He asked Deo what he thought, and Deo said he would not buy it. Crump nevertheless bought one bag for $150. Outside, defendant and Crump had another conversation in which Crump asked where he could contact defendant if he wanted to buy some more, and defendant told him that Deo knew where he lived. Defendant further said that after leaving in his car, he got to Wilmington and heard a horn blowing. Crump was behind him; and defendant stopped, got out of his car, and walked over to Crump's car. He and Crump negotiated for the sale of the remaining bag of "marijuana," and Crump paid defendant $135 for it.

Defendant said that he went by his house, stayed for about half an hour and then went by his cousin's house for about five minutes. He and Ashley then had something to eat, returning to the cousin's house. Ashley left, but defendant stayed on. He spoke with his girl friend by telephone, but she said her car was not running. They had a long argument over the telephone, after which defendant hung up on her. Later, defendant went to Primer's house. Primer, Mays and Primer's brother "Spoody" were there. Defendant stayed for 20 or 25 minutes and then went to a gambling club at 91st and Western. He used some of the money he had received for the sale of the alleged marijuana. He finally reached home about 1:30 a.m. and went to bed. He was awakened about 5 or 5:30 by police officers, who took him to the Compton police station. Defendant said he was not told what he was being booked for, adding that he knew he had made a "bunco" sale. He said he did not know how blood spots got on his shoes or shorts. (There were some very small blood spots on defendant's shorts and one of his shoes.)

Defendant's mother, Ruth Rhinehart, testified in defendant's behalf. She said that defendant was not at home when she went to bed around 11:30 on August 25, 1969, but that she heard him come in some time between 1 and 1:30 a.m. She testified regarding the visit from the police officers when they came to arrest defendant. She said that they told her defendant was wanted for murder, but that no officer spoke to her about murder in defendant's presence. She informed the officers in which bed-room defendant could be found and gave them permission to search the house.

No person whom defendant claimed to have been with during the evening of August 25, 1969, was called to testify in his behalf in sub-stantiation of his alibi. Ashley, one of the persons he said he was with that evening, testified; but he was called as a witness for the People, and, as hereinabove shown, his testimony put defendant at the scene of the crime at the time of the shootings.

Defendant contends that the trial court erred in denying his motion to appear in propria persona, but there is no merit to this contention. Before a defendant may be permitted to waive his right to counsel, the trial court must determine that he is competent to represent himself (*People* v. *Williams,* 2 Cal.3d 894, 908 (13) [88 Cal.Rptr. 208, 471 P.2d 1008]) and has an intelligent conception of the consequences of his act (*People* v. *Robles,* 2 Cal.3d 205, 218 (9) [85 Cal.Rptr. 166, 466 P.2d 710]). As stated by this court in *Robles* at page 218 (10), "The determination of the trial judge as to the defendant's competence to

waive counsel involves an exercise of discretion by the trial judge which in the absence of an abuse of discretion will not be disturbed on appeal."

In the present case, the record shows that defendant's original motion was heard at sessions on September 25 and 26, 1969, and that on November 17, 1969, the trial court again considered defendant's request that he be allowed to represent himself. The trial court made inquiries with respect to defendant's background and undoubtedly observed his actions in court to determine his fitness to represent himself, and no abuse of discretion has been shown.

During the course of the proceedings, defendant made it clear that he recognized the nature and seriousness of the charges against him and the possible punishment to which he could be subjected. (*In re Johnson,* 62 Cal.2d 325, 335 [16] [42 Cal.Rptr. 228, 398 P.2d 420]; *In re James,* 38 Cal.2d 302, 313 [9] [240 P.2d 596].) The basis for his motion to represent himself was that he did not want to be represented by an attorney from the public defender's office, because he believed that no competent attorney would remain there but would, rather, go into private practice, where he supposedly could earn more money.

At the first hearing on defendant's motion, the trial court referred to the fact that defendant had previously asked another judge if he could represent himself. In response to the trial court's inquiry if that was what he wanted to do, defendant stated: "Well, I don't want no P.D., no Public Defender, Your Honor." When the trial court asked his reason, defendant said: "Because none of them—they're just not capable, and this is involving my life, and I just don't think any one of them would be capable enough after I seen these dump trucks around here. I couldn't have a man up there with my life. I'd rather do it myself." After defendant made this statement, the trial court commented on the training of the deputy public defender appointed to represent defendant and pointed out that he had had approximately 10 years' experience, had represented many persons in murder cases, and was an extremely able attorney.

The trial court asked defendant what schooling he had had (defendant finished high school in 1963, about six years prior to the time of the hearing) and questioned him regarding his experience in the Army (defendant once represented himself in a military court on a charge of assault, but had had no training in the law). The trial court then sought to ascertain from the prosecuting attorney whether or not the People would ask for the death penalty. When the prosecuting attorney indicated he did not know, the trial court stated: "Well, I am going to trail this until tomorrow morning, Mr. Rhinehart, with no prejudice to your motion here, but I

think I have to know to some extent, without getting into the facts of the case, just what—how serious this is."

At the hearing held the following day, after the prosecuting attorney summarized the evidence the trial court indicated that, in view of the seriousness of the charge and the potential drastic consequences that the case could involve for defendant, he felt that defendant was not in a position to represent himself. The trial court then pointed out to defendant his great need for a very skilled advocate.

In a discussion which followed, defendant indicated dissatisfaction with the representation given him by the deputy public defender at the preliminary hearing. Referring to questions he felt should have been asked but were not, he said, ". . . Like the girl's testimony, which she's supposed to have seen me from a hundred feet away, recognized me by a profile." The trial court immediately cautioned defendant, "Well, I want you to be very careful." Again stressing defendant's need for a skilled advocate and the responsibility of the court to see that he had adequate representation, the trial court denied defendant's motion.

On November 17, 1969, defendant again requested that he be permitted to represent himself. At that time, he stated: "Well, I just feel, due to the magnitude of the crime, that the Public Defender that I have is not capable of really handling this case because of a heavy case load. I think that I should have the right to defend myself, pro per, or have a State-appointed attorney." The trial court then questioned the deputy public defender and determined that he had adequate time to devote to defendant's case. At the conclusion of the hearing, the trial court nevertheless stated, "Well, I will pass on this and give it some further thought, Mr. Rhinehart." Later the same day, however, the trial court denied defendant's motion.

■ Defendant's desire to defend himself on the ground that he did not want an attorney from the office of the Public Defender of Los Angeles County to represent him is not a sufficient basis for granting his motion to represent himself. As pointed out by this court in *People* v. *Adamson,* 34 Cal.2d 320, 333 [16] [210 P.2d 13]; "This court can take judicial notice . . . that it would be difficult to find in California any lawyers more experienced or better qualified in defending criminal cases than the Public Defender of Los Angeles County and his staff."

Furthermore, as hereinabove appears, during the course of the proceedings defendant was apparently on the verge of making damaging admis-

sions; and the court could properly have considered this factor in determining that he did not have the capability of representing himself.

Finally, unlike the situation in *People* v. *King,* 276 Cal.App.2d 781 [81 Cal.Rptr. 336], where the record showed that the defendant, who was 38 years old, was "reasonably articulate, more clear and grammatical than some members of the Bar in his off-the-cuff responses" (p. 785), defendant did not speak in a grammatically correct manner or express himself with great clarity. This, also, together with his youth, was a factor which the trial court may properly have considered.[1]

■ Defendant further contends that the trial court abused its discretion in denying him permission to use the jail's law library. However, as pointed out in *In re Harrell,* 2 Cal.3d 675, 695 [87 Cal.Rptr. 504, 470 P.2d 640], an inmate in a prison has no right to the use of a law library except as is necessary to insure access to the courts. Accordingly, since defendant was represented by counsel, and no showing was made that counsel needed his assistance in researching the law, the trial court did not abuse its discretion in denying defendant permission to use the law library. (See *People* v. *Mattson,* 51 Cal.2d 777, 795, 797 [336 P.2d 937].)

Defendant next contends that his motion to suppress, pursuant to section 1538.5 of the Penal Code, was improperly denied, but the record shows that the trial court's action was fully warranted. In its totality, the evidence at the hearing on defendant's motion shows that the police had ample probable cause to arrest him. From the testimony of detectives working on the case, it appears that prior to defendant's arrest Miss Rodgers had told the detectives that shortly after 9 p.m. on August 25, 1969, she had seen two cars come onto 137th Street and stop almost directly across from her residence; that one of them was a 1957 black Chevrolet, and the other was a late model blue Pontiac; that she saw a male Negro in his late teens or early 20's, over six feet tall, probably six feet two or three, having a heavy muscular build and weighing in excess of 200 pounds, with dark complexion and with hair in a medium natural hair style, get out of the 1957 black Chevrolet and enter the Pontiac; that she heard some shots and saw a female person get out of the Pontiac and crawl under a car behind it; that the male Negro was standing there with a gun in his hand; that in the

---

[1]As pointed out above, there is ample support in the record for the exercise of the trial court's discretion in denying defendant the right to proceed in propria persona. It should be noted, incidentally, that this court in *People* v. *Sharp,* 7 Cal.3d 448, 455 [103 Cal.Rptr. 233, 499 P.2d 489], and *People* v. *Siegenthaler,* 7 Cal.3d 465, 471 [103 Cal.Rptr. 243, 499 P.2d 499], held that there is no constitutional right to self-representation.

meantime the black Chevrolet had left the scene; that she then saw the male Negro go back to the Pontiac and push away something that looked like a person in the driver's seat; and that that person flopped over, and the male Negro got into the Pontiac and drove away.

The detectives further testified that a slip of paper with a telephone number written on it had been found at the scene; that an officer had gone to the home of George Deo, to whom the telephone number belonged, trying to locate him, and had left word that the police wanted to talk with him; that Deo, neatly dressed, came to the Compton police station at approximately 11 p.m. August 25, 1969, and later went to the hospital, viewed the body of the female victim, and identified it as Patricia Graham, whom he knew personally; that when Deo returned to the police station, he said that the only one he could think of who would do such a thing would be defendant; and that when asked why he thought this, Deo said that defendant had a violent temper and owed Miss Graham's boy friend, Osborne Crump, some money, which they had been trying to collect from defendant that evening, that he himself had tried to help them find defendant and had either taken them over to the house of defendant's mother or directed them there, and that Crump and Miss Graham were together in her car.

The detectives further testified that Deo informed them that Miss Graham's mother lived at an address on 156th Street, and they interviewed the mother there around 3 a.m. on August 26, 1969, at which time they obtained the pink slip on Miss Graham's car, which was a late model, silver blue, two-door Pontiac; that Deo said he had seen defendant in a 1957 black Chevrolet earlier that evening; that after Deo mentioned defendant as a possible suspect, they checked the police records and found an incident card on defendant, showing several arrests, which card gave a description of defendant as a male Negro, adult, 23 or 24 years of age, six feet three, 200 pounds, black hair, and brown eyes; that Deo tried to help them locate defendant and informed them that he might possibly be found at his mother's home at 1708 Graham Street; and that defendant was found and arrested there around 5:30 a.m. on August 26, 1969.

As stated in *People* v. *Ross,* 67 Cal.2d 64, 69-70 [60 Cal.Rptr. 254, 429 P.2d 606]: "A peace officer may arrest a person without a warrant whenever he has reasonable cause to believe that the person to be arrested has committed a felony. [Citation.] 'Reasonable cause' is defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.] No exact formula exists for determining reasonable cause, and each case must be decided on the facts and circumstances presented to the officers at the time they were required to act."

In the present case, since Deo had not seen defendant commit the crime, his statement, if uncorroborated, would not be sufficient to provide probable cause for the arrest. (See *Mann* v. *Superior Court,* 3 Cal.3d 1, 6-7 (1) [88 Cal.Rptr. 380, 472 P.2d 468].) However, as hereinabove appears, Deo's statement was corroborated, as a result of which the officers were entitled to rely on it.[2]

■ Under all the circumstances, we hold that there was ample probable cause to arrest defendant at the time he was taken into custody and that the evidence seized by the officers at the time of his arrest (consisting only of several items of defendant's clothing with small blood spots on them), as well as his statements and his fingerprints on the car of one of the victims, was properly received in evidence.

■ Defendant next contends that the trial court erred in not granting a mistrial or admonishing the jury when a witness indicated that the victim, Miss Graham, worked in the office of "Congressman Bradley." While Miss Graham's sister was testifying, she was questioned about Miss Graham's work hours and the location of her place of employment. In answering, she inadvertently mentioned that the victim worked in "Congressman Bradley's" office.

To begin with, the witness referred to Mr. Bradley incorrectly as "Congressman," when he actually is a councilman. In addition, she never mentioned Mr. Bradley's first name and did not testify as to what Miss Graham did in his office. Under the circumstances, no prejudice resulted from her mentioning who her sister's employer was, particularly since she used the wrong title, that is, "Congressman" instead of "Councilman." In any event, since the case against defendant was very strong, any error in this respect would clearly have been nonprejudicial.

Defendant urges that the trial court committed constitutional error in permitting his identification by photographs, rather than by means of a lineup, and in the absence of counsel. No lineup was held, but three witnesses at the scene of the shootings were, after defendant's arrest, while he was in

---

[2]For instance, the description which Miss Rodgers gave of the suspect matched that of defendant; and resemblance of a party to a suspect is a factor in probable cause. (See *People* v. *Prather,* 268 Cal.App.2d 748, 752 [4] [74 Cal.Rptr. 82]; *People* v. *Mitchell,* 251 Cal.App.2d 641, 644 [4] [59 Cal.Rptr. 677].) Also, it will be recalled that Miss Rodgers had seen a black 1957 Chevrolet and a late model blue Pontiac involved at the scene of the crime, and it had been determined that the victim, Miss Graham, owned a late model blue Pontiac and that Deo had seen defendant in a black 1957 Chevrolet during the afternoon of the day of the murder. Probable cause can also be supplied by the matching description of vehicles. (See *People* v. *Schader,* 62 Cal.2d 716, 722 [2a] [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Chandler,* 262 Cal.App.2d 350, 354 [1] [68 Cal.Rptr. 645].)

custody and in the absence of his counsel, shown a series of six photographs, including one of defendant. Lynn Rodgers selected three of the photographs, including the one of defendant, as resembling the man she had seen. Earl Rodgers likewise selected three, including defendant's. Evelyn Green picked two, one "for sure" and another as a "possibility." The latter was defendant's photograph. ■   There is no right to counsel at a photographic identification, and no denial of due process resulted from the pro-. cedure followed here. (*People* v. *Lawrence,* 4 Cal.3d 273, 275 (1) [93 Cal.Rptr. 204, 481 P.2d 212].)

■   Defendant contends that the prosecutor was guilty of misconduct in his opening statement. Vernon Edward Smith had testified at the preliminary hearing on September 4, 1969, to potentially incriminating statements made by defendant to him after the latter's arrest and while they were cellmates.[3] In his opening statement, the prosecutor referred to these statements and to Smith's anticipated testimony. A day or so before the People were ready to rest their case in March 1970, an investigator from the district attorney's office interviewed Smith and learned that he had recanted on his prior statements and would not testify to the same effect at the trial. Smith was not put on the stand.

Just before resting the People's case, the prosecutor, outside the presence of the jury, offered into evidence, to show his good faith in having made the statements in his opening statement, part of the transcript of the preliminary hearing. The transcript, showing the statements testified to by Smith at that time, was read by the judge but not shown or read to the jury. The prosecutor explained that Smith had recanted, but he offered to put him on the stand anyway if defense counsel desired.

The prosecutor had not dwelt at length on the issue in his opening statement, and the trial court pointed out that the jury had been told that an opening statement was not evidence and that he had watched the jurors carefully during the opening statement and had seen that none of them had taken notes. The trial court suggested that to put Smith on the stand would only emphasize the fact that he had said something on another occasion

---

[3]Smith testified that he shared a cell at the Compton jail with defendant and two other inmates; that on August 26, 1969, he was taken from the cell to have a conversation with one of the police officers, but that he did not have the conversation because the officer who was going to talk with him learned just as Smith was brought into the interview room that a car with a dead body had been located; that when he was returned to his cell, so that the officer could go out immediately and investigate, he mentioned generally why he had been brought back so soon; and that defendant asked if the car had been found on Willowbrook. (The Pontiac with Crump's body was found at the corner of Willowbrook and Piru.)

that would have been prejudicial to defendant's cause. Defendant's motion for a mistrial was then denied.

Misconduct has been defined to be a dishonest act or an attempt to persuade the court or the jury by the use of deception or reprehensible methods. (See *People* v. *Asta,* 251 Cal.App.2d 64, 86 [16] [59 Cal.Rptr. 206]; *People* v. *Baker,* 207 Cal.App.2d 717, 724 [9] [24 Cal.Rptr. 691].) ▮ The burden of proof is on the defendant to show the existence of misconduct. (See *People* v. *Asta, supra,* 251 Cal.App.2d 64, 87.)

It is not misconduct to refer in an opening statement to testimony which a prosecutor is unable to produce, unless bad faith is shown or the statement is made without an intent to support it by evidence. (See *People* v. *Berryman,* 6 Cal.2d 331, 336 [1] [57 P.2d 136]; *People* v. *Green,* 236 Cal.App.2d 1, 18 [16] [45 Cal.Rptr. 744].) This is particularly true when, as in the present case, the prosecutor has told the jury that his statements to them are not considered to be evidence. (See *People.* v. *Williams,* 202 Cal. App.2d 387, 397 [20 Cal.Rptr. 740].)

The prosecution's failure to interview Smith prior to the time of the opening statement does not show bad faith, since the prosecution had a right to assume that Smith's testimony at the trial would correspond to his testimony under oath at the preliminary hearing. ▮ Under the circumstances, there has been no showing that the prosecutor acted in bad faith or improperly.

▮▮ Defendant further contends that the trial court erred in refusing to give an instruction on manslaughter. At the trial, the People introduced evidence that the murders were cold-blooded homicides committed in the course of a robbery, but defendant contended that he was not even present at the scene of the crimes, and he introduced evidence of an alibi. He now argues, however, that since there was evidence that Crump had sought him because he owed Crump some money, and since it could be inferred that Crump was angry with him because of a "bunco sale," and one witness had heard a commotion (talking) going on at the car just before the shots were fired, the jury could have concluded that Crump initiated a quarrel and that he (defendant) acted in the heat of passion.

As stated by this court in *People* v. *Williams,* 71 Cal.2d 614, 624 [9] [79 Cal.Rptr. 65, 456 P.2d 633]: "Adequate provocation as an element of voluntary manslaughter must be affirmatively demonstrated; it cannot be left to speculation." Since defendant's theory for manslaughter instructions was purely speculative, the requested instructions on manslaughter were properly refused.

Defendant questions the propriety of the method of selecting juries in this state during the time the death penalty was in effect. At that time, it was permissible to excuse for cause a prospective juror who made it unmistakably clear that he would never impose the death penalty under any circumstances. (See *In re Tahl,* 1 Cal.3d 122, 136-137 [81 Cal.Rptr. 577, 460 P.2d 449]; *People* v. *Nicolaus,* 65 Cal.2d 866, 882 [15] [56 Cal.Rptr. 635, 423 P.2d 787].) Defendant contends that such a method of selection, used in his case, results in a guilt-oriented jury.

Although defendant admits that *Witherspoon* v. *Illinois,* 391 U.S. 510, 517 [20 L.Ed.2d 776, 782, 88 S.Ct. 1770], stated that no study of any probative value existed on the issue at that time, he refers to a study made since *Witherspoon, New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process* by George L. Jurow in 84 Harvard Law Review 567, and argues that this study supports his contention.

A perusal of this sociological study, limited as it is to the responses of 211 volunteer participants, all of whom worked in New York for the Sperry Rand Corporation, does not convince this court that reconsideration of the principles enunciated in *Witherspoon* is called for by reason of the study. The author himself admits that his study is weak, in that the participants acted individually instead of as a group like a jury would; there was no responsibility as in a real jury; there is difficulty in describing the "typical juror"; and the problem of the order and timing of the tests, the paying of the participants, and the use of "volunteers" were all uncertain. (See pp. 596-597 of 84 Harv.L.Rev.)

Although there is no merit to any of defendant's contentions hereinabove discussed, there is, in view of this court's decision in *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], merit to his further contention that the death penalty violates our state constitutional provision against cruel or unusual punishment. Accordingly, the judgment is modified to provide for life imprisonment and, as so modified, is affirmed.

**McCOMB, J.**—I concur in the majority opinion, except that, for the reasons expressed in my dissenting opinion in *People* v. *Anderson,* 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880], I dissent from the modification of the judgment.