[Crim. No. 36071. Second Dist., Div. Three. Oct. 30, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
MATTIE BELINDA EVANS, Defendant and Appellant.

COUNSEL

Abelson, Harris & Brunon, Robert N. Harris and Richard E. Ross for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Richard L. Walker, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RICKS, J.***—Appellant Mattie Belinda Evans (Evans) appeals from a jury trial conviction of grand theft (Pen. Code, § 487), embezzlement by a public officer (Pen. Code, § 424, subd. 1), and falsification of public records (Gov. Code, § 6200).

Probation was denied and Evans was sentenced to state prison for the term prescribed by law on the grand theft conviction. The sentences for embezzlement and falsification of public records were stayed pending service of the grand theft sentence.

CONTENTIONS

Evans contends that the trial court (1) failed to inquire adequately as to Evans' capacity to represent herself at trial; (2) improperly instructed the jury; and (3) failed to stay the sentences for embezzlement and falsification of public records pending service of her grand theft sentence.

We find these contentions to be without merit for the reasons stated below.

FACTS

Evans was employed as an eligibility worker for the Los Angeles County Department of Public Social Services from the middle of 1976 to early 1977. Her duties included interviewing clients and reviewing documents and information to determine the eligibility of clients for public assistance programs. Additionally, Evans determined the amount of each client's eligibility.

In appropriate cases Evans was responsible for completing emergent aid requisitions for qualified clients, thereby initiating the procedure for the issuance of welfare checks. Evans also had the responsibility of completing overpayment forms. Evans was assigned to the El Monte office and had a caseload of between 120 and 140 cases.

Karen Sampson (Sampson) was receiving public assistance from the County of Los Angeles in December 1976. Evans interviewed Sampson

---

*Assigned by the Chairperson of the Judicial Council.

at the El Monte district office, completed an emergent aid requisition form for Sampson, and initiated the issuance of two checks. At Evans' request, Sampson signed the checks and returned them to Evans.

Evans was also assigned to Thelma Buchanan (Buchanan) in January 1977. Evans informed Buchanan that she had been overpaid $516 and therefore would have to repay that amount. Buchanan was further informed that if she did not make repayment a warrant would be issued for her arrest. Buchanan obtained and delivered $511 to Evans.

Additionally, Evans was assigned to Susie Garcia (Garcia) in December 1976. Evans informed Garcia that she had been overpaid $301. Garcia responded that she did not have $301. Evans then left the room and returned with two checks totaling $301. Evans had Garcia endorse each check and retained both of them.

Similar transactions occurred between Evans and aid recipients Rosie Roman, Mary Huerta, Henry Patino, Irene Mendoza, Jesusita Valero and Blasa Jenkins. Valero sold her house to obtain the money requested by Evans.

Arthur Cutler (Cutler) was Evans' supervisor for approximately four months. Cutler reviewed the case files of Sampson, Buchanan, Garcia, Rosie Roman, Mary Huerta, Henry Patino, Irene Mendoza, Jesusita Valero and Blasa Jenkins but found no evidence of overpayment in any of these cases.

Lois Polak, supervising clerk for Los Angeles County, examined the cashier's records and found that no monies for overpayments had been received by the County of Los Angeles for any of the above listed clients.

*Defense*

While Evans was Donna Hall's (Hall) social worker from September 1976 to January 1977, she cashed Hall's welfare and social security checks. Hall did not have the proper identification necessary to cash the checks herself. Evans always gave Hall the correct amount of money and never told her that she had been overpaid or owed the county money.

Evans was given two round-trip tickets to Hawaii and approximately $2,500 by her son, Mitchell McDowell (McDowell), in December 1976 or January 1977. McDowell had obtained the money by signing a record deal.

## DISCUSSION

▪ Evans initially contends that the trial court failed to obtain an express waiver of counsel, neglected to advise her of the possible punishments for the charged crimes, and failed to tell her that she would not be able to claim incompetency of representation on appeal if she chose to represent herself. Additionally, Evans contends that the trial court did not make adequate inquiries into her capacity to represent herself and failed to inform her that she had a right to retained or appointed counsel. We disagree.

"A defendant in a criminal proceeding has a federal constitutional right to represent [herself] without counsel if, upon timely motion [citation], the trial court determines that [she] voluntarily and intelligently elects to do so [citation]. If these conditions are satisfied, the trial court must permit an accused to represent [herself] without regard to the apparent lack of wisdom of such a choice and even though the accused may conduct [her] own defense ultimately to [her] own detriment. [Citation.]" (*Ferrel* v. *Superior Court* (1978) 20 Cal.3d 888, 891 [144 Cal.Rptr. 610, 576 P.2d 63]; see *People* v. *Wilks* (1978) 21 Cal.3d 460, 467-468 [146 Cal.Rptr. 364, 578 P.2d 1369].)

▪ Our Supreme Court in *People* v. *Teron* (1979) 23 Cal.3d 103, 113 [151 Cal.Rptr. 633, 588 P.2d 773], has also stated: "Before granting defendant leave to represent [herself], the trial court must determine 'whether the defendant has the mental capacity to waive [her] constitutional right to counsel with a realization of the probable risks and consequences of [her] action.' [Citations.] It is not, however, essential that defendant be competent to serve as counsel in a criminal proceeding [citation]; '[her] technical legal knowledge, as such, [is] not relevant to an assessment of [her] knowing exercise of the right to defend [herself].' (*Faretta* v. *California, supra*, 422 U.S. 806, 836....) [¶] In *Faretta*, the Supreme Court...observed that 'The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will.' (422 U.S. at p. 835....)" Evans has the burden of establishing that she did not

competently and intelligently waive her right to counsel. (*People* v. *Barlow* (1980) 103 Cal.App.3d 351, 372-373 [163 Cal.Rptr. 664]; *People* v. *Perkins* (1970) 7 Cal.App.3d 593, 599 [86 Cal.Rptr. 585].)

The trial court in the case at bar specifically observed that Evans "appear[ed] to be a woman of considerable intelligence and education." As an eligibility worker for the Department of Social Services of the County of Los Angeles, Evans' duties included interviewing clients and reviewing documents and information to determine public assistance eligibility. It is also noteworthy that Evans was representing herself in other criminal matters.[1] When Evans was interrogated at length by the court,[2] she gave no indication that she was not competent to waive counsel. The trial court carefully and repeatedly warned her of the risks of self-representation; she acknowledged those risks and persisted in her desire to represent herself.

---

[1] Evans' attorney informed the court that "[s]he [Evans] has two other felony cases which are presently pending, which she is handling pro per, and indicates she is being successful in handling it for her side...."

[2] The following colloquy occurred between the court and Evans:

"THE COURT: All right. Mrs. Evans, do you understand, first of all, I keep trying to tell people, and they always ignore me, and you have the right to ignore me, too, but let me tell you, so that we all understand that you know what you are doing. I don't think you know how to remove your own appendix; I don't, anyhow, and if I need any medical help, I go see a doctor. The same thing definitely applies with lawyers, and yet, for some reason, everybody seems to think they know how to do their own legal work.

"You understand that Mr. Russell has been an attorney of many years' experience. You are opposing an attorney on the other side who has many years of experience, who is very capable. All he does is prosecute people charged with crimes, and he knows his business very well.

"Your attorney, Mr. Russell, knows his business very well. I can tell you that, because I've been with him on trials before.

"Now you say you want to give this up, and you want to just represent yourself, is that correct?

"THE DEFENDANT: That is correct.

"THE COURT: Do you feel confident that you know how to handle your own case, even though, I assume, would I be correct, that you've never had any legal training?

"THE DEFENDANT: I've never had legal training per se.

"THE COURT: All right. You understand, then, of course, you are going into this totally inexperienced against a man who is quite experienced in these things. When you go into trial, I'm not concerned with your disrupting anybody. You're not that kind of person. But I want to make sure you understand that I'm not going to be sitting up here helping you to handle your case. By the nature of things, you've got to make a lot of mistakes. It just happens that people do.

"I'm talking about the technicalities. And when you make these mistakes, I'm not going to correct you and say, no, here's how you do it, or why didn't you make this motion, or why don't you make this objection.

"Mr. Owens for the People may well offer things in evidence which are hearsay and would not be admissible that your attorney would know about to make objections. You very likely will not know about it, and I'm not going to say a word, because it's not this court's, the judge's job to interrupt those things, and a lot of testimony is going to come

The trial court's determination as to Evans' competence to waive counsel involves an exercise of discretion which in the absence of abuse will not be disturbed on appeal. (*People v. Teron, supra,* 23 Cal.3d at p. 114; *People v. Rhinehart* (1973) 9 Cal.3d 139, 147-148 [107 Cal. Rptr. 34, 507 P.2d 642], disapproved on other grounds in *People v. Bolton* (1979) 23 Cal.3d 208, 213 [152 Cal.Rptr. 141, 589 P.2d 396]; *Curry v. Superior Court* (1977) 75 Cal.App.3d 221, 227 [141 Cal.Rptr. 884].)

The trial court is not required to use specific words in making its inquiry. ". . . while it is true that in *Lopez* by way of dicta we sought to provide certain guidance for future cases in the form of what course of inquiry might be pursued in search of the answer to the ultimate question, such guidance by no means was intended to cast in concrete the requirement that the trial court use such language in every case or suffer the pain of a brand of reversible error." (*People v. Barlow, supra,* 103 Cal.App.3d at p. 370; *People v. Lopez* (1977) 71 Cal.App.3d 568, 571 [138 Cal.Rptr. 36].)

We do not find that the trial court abused its discretion in granting the motion for self-representation.

Evans next contends that the trial court improperly instructed the jury that Penal Code section 424 applies to a county eligibility

---

in against you which might not be admissible otherwise.

"If there are motions to be made, nobody is going to tell you when a motion should be made. You're going to be just left there practically defenseless, as far as I'm concerned. The only reason I'm going through all of this with you is that the Supreme Court says if anybody wants to be foolish enough to represent themselves, they have the constitutional right to do what I believe is practically assuring conviction of yourself. If you want to do that, you have the right to do it, but I do have to make sure that you understand that.

"I have no doubt about your intelligence, or in other ways. Let me say for the record that I have seen Mrs. Evans many times in here. She appears to be a woman of considerable intlligence [*sic*] and education, and as far as the normal things we would ask people, perhaps, do you know how to read and write, I wouldn't even embarrass you by asking you those questions or attempt to, but I do want to try to impress upon you that you are charged with a very serious offense, and the court is not going to look on you any more sympathetically because you represented yourself rather than having an attorney that you have had all along. That doesn't make any difference. If you get convicted, and you're before me for sentencing, I'm not going to consider that in any way. You're facing a serious possibility of now, as you know, that a state penitentiary sentence is called for on a case of this sort. Of course, the court considers probation, and so forth, but nevertheless, that's not saying that I would, and if you want to take that chance, of course, you're entitled to, but I've got to make sure that you understand you know what you are doing when you waive all these rights.

"Now, is that your wish still, nevertheless, after all this explanation, do you still want to represent yourself?

"THE DEFENDANT: My wish is to represent myself."

worker and that the issuance of an emergency aid request by such a worker constitutes disbursement of public monies within the meaning of that section.[3] She argues that by giving this instruction the court effectively directed the jury to enter a guilty verdict as to the embezzlement charge. We find this contention to be without merit.

■ The trial court must instruct the jury as to the "general principles of law relevant to the issues raised by the evidence" (*People* v. *Saddler* (1979) 24 Cal.3d 671, 681 [156 Cal.Rptr. 871, 597 P.2d 130]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1]).

■ In an emergency situation, an eligibility worker, such as Evans, could complete an emergent aid requisition and a check would be issued to a client in the office. The purpose of this procedure is to issue a check to clients who cannot wait for the usual computer-issued check to arrive in the mail. The eligibility worker determines the amount to which the client is entitled, completes the emergent aid requisition and has the client sign the form. The emergent aid requisition is next submitted to the supervisor for preliminary approval and then to the district director or deputy district director for final approval. Lastly, the approved requisition is presented to the cashier by the eligibility worker and a check is issued to the client.

When any overpayment to a client is discovered, a form is completed by the eligibility worker. This form includes information delineating the dates for which overpayment exists, the reason for overpayment, the resources of the client from which overpayment may be collected, the plan for recovery of the overpayment and the length of repayment.

The issue becomes whether Evans, as an eligibility worker with the duties described above, is a "person charged with the receipt, safekeeping, transfer, or disbursement of public moneys." (Pen. Code, § 424.) In reviewing this issue, the court in *People* v. *Battin* (1978) 77 Cal.App.3d

---

[3]The court gave the following instruction: "An Eligibility Worker for the County of Los Angeles is a person charged with the receipt, safekeeping, transfer and disbursement of public monies within the meaning of Section 424 of the Penal Code.

"The issuance of an Emergent Aid Requisition by an Eligibility Worker is one step in the procedure for causing the County to pay out public money to welfare recipients. This is sufficient for being charged with disbursement within the meaning of Section 424 of the Penal Code.

"The preparation of an Overpayment Record...is one step in the procedure for collecting overpayments to welfare recipients. This is sufficient for being charged with receipt within the meaning of Section 424 of the Penal Code."

635, 649 [143 Cal.Rptr. 731, 95 A.L.R.3d 248], stated: "Defendant contends, however, that he did not 'disburse' public moneys within the meaning of section 424, subdivision 2, because he did not have actual custody of the moneys paid to his staff. To support his argument, defendant relies on the legislative history of the section and on *People* v. *Knott*, 15 Cal.2d 628 [104 P.2d 33, 128 A.L.R. 1367], and *People* v. *Dillon*, 199 Cal. 1 [248 P. 230]. The same contention, and the same authorities were utilized by the defendant in *People* v. *Qui Mei Lee*, 48 Cal.App.3d 516 [122 Cal.Rptr. 43]. The court therein, however, rejected the defendant's contention, holding that *Knott* and *Dillion* did not limit section 424, subdivision 2's, applicability solely to officers having actual custody of public funds. In fact, the court in *Qui Mei Lee* stated that defendant's approval of invoices for medical and lab services, which were then automatically paid by the county auditor, enabled defendant to control the disbursement .of public moneys within the meaning of the statute. Similarly, in *People* v. *Sperl*, 54 Cal.App.3d 640 [126 Cal.Rptr. 907], the defendant had authorized his secretary to credit county employees with hours spent on noncounty activities. The Court of Appeal upheld the defendant's conviction under section 424, subdivision 3, stating: '...the...time records "related" to the disbursement of public moneys. These records were used as the basis for the disbursement of county funds to the various employees....'" (See *People* v. *Hess* (1951) 107 Cal.App.2d 407, 426 [237 P.2d 568].) In the instant case, Evans had the authority to complete the emergent aid requisitions necessary to expedite the issuance of checks to public assistance recipients. This authority was sufficient to satisfy the requirements of section 424 of the Penal Code.

Accordingly, we find that the instruction given by the court was proper.

Evans properly withdraws her final contention that the trial court did not stay execution of her sentences for embezzlement and falsification of public records pending service of her grand theft sentence. A review of the record reveals that the court did in fact make such an order.

The judgment is affirmed.

Cobey, Acting P. J., and Potter, J., concurred.

A petition for a rehearing was denied November 25, 1980, and appellant's petition for a hearing by the Supreme Court was denied December 24, 1980. Bird, C. J., was of the opinion that the petition should be granted.