[Crim. No. 20538. Jan. 11, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY JOHN TERON, JR., Defendant and Appellant.

## Counsel

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Charles M. Sevilla, Chief Assistant State Public Defender, and Donald L. A. Kerson, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley

D. Mayfield and Karl Phaler, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**TOBRINER, J.**—Defendant Gregory Teron, convicted of first degree murder and sentenced to die, comes before us on automatic appeal. **(1a)** After obtaining permission from the trial court to represent himself, defendant questioned no witnesses and presented neither evidence nor argument on his own behalf. Appointed appellate counsel now argues that the court erred in permitting defendant to represent himself. We conclude, however, that on the record before it the trial court properly ruled that defendant was competent to waive counsel and thus to represent himself. (See *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) A defendant is not obligated to present a vigorous defense; the decision to plead guilty, or simply not to oppose the prosecution case, is one which a competent defendant has a right to render.

▮ We explain, however, that although the conviction for first degree murder must be affirmed, the judgment imposing the death penalty cannot stand. Defendant's crime occurred on October 4, 1975; yet the state seeks to impose the death penalty under a statute effective August 11, 1977. The Legislature, in enacting the 1977 statute, plainly intended to increase the penalty for first degree murder under particular circumstances. An established principle of statutory interpretation declares that a statute which increases the penalty for a crime should be construed to apply only to crimes committed after the effective date of the new legislation. Accordingly, we conclude that the 1977 statute does not apply to defendant's offense. In light of this conclusion, we have no occasion in the instant case to pass on the constitutional validity of the 1977 or 1978 death penalty legislation.

1. *Summary of proceedings*

On January 18, 1978, the Grand Jury of Orange County indicted defendant, accusing him of the murder of Earl Reed on October 4, 1975. The indictment specified that defendant personally committed the acts causing Reed's death, and that defendant had been previously convicted of two other murders. Defendant pled not guilty.

On April 7, 1978, defendant asked the court to relieve the public defender and to grant defendant permission to represent himself. Defendant offered to state the reasons for his request, but the court, advised by the public defender that the explanation might incriminate or prejudice defendant, declined to hear the explanation. Instead, the court interrogated defendant at length to determine that defendant's waiver of counsel was voluntary, knowing, and intelligent; the court explained at length the dangers and disadvantages of self-representation.

The interrogation revealed that defendant was literate, had been educated through sophomore year in high school, and was familiar with criminal proceedings from past experience. In response to questions, defendant demonstrated that he understood the distinction between manslaughter, second degree murder, and first degree murder, but that he did not understand the felony-murder rule. He affirmed, however, that despite the deficiencies in his legal knowledge, he still wanted to represent himself. The court inquired if defendant had ever suffered from mental illness or received treatment for psychiatric disability; defendant responded "no." Defendant then stated that "In the past, trials I've been involved in, I was never aware of the right that I could represent myself. . . . Now that it has come to my attention, I'm able to do so, that is what I want to do."

The trial court expressly found that defendant "has made . . . a voluntary and intelligent and understanding waiver of his right to be represented by counsel. I'm satisfied that the defendant is taking this action against the advice of this court, and he is fully advised and aware of the pitfalls, dangers and consequences of acting as his own attorney." The court then granted defendant a seven-day continuance to prepare for trial, and offered to appoint the public defender as standby counsel (see *Faretta* v. *California, supra,* 422 U.S. 806, 834-835, fn. 46 [45 L.Ed.2d 562, 581]). The public defender declined the appointment, stating that "I don't feel that I could ethically have any participation in this case in view of the way the defendant wants to proceed."

On April 25, the day before trial was scheduled to begin, defendant waived trial by jury. The court took up the motion to suppress the tape recording of defendant's confession, filed earlier by the public defender; defendant stated that "whichever portions of that tape recording that [the prosecutor] wants to admit is perfectly fine with me."

Trial commenced on April 26. Prosecution witnesses testified that Reed, the victim, checked into the Caravan Inn in Anaheim at 9 p.m. on

October 3, 1975. Reed rented room 227; defendant occupied room 229 on a weekly basis. At about 3 a.m. a Mr. White, staying in room 228, heard a cry, "Help. They are killing me. This is murder." Although similar cries continued for about five minutes, he did not investigate the source of the noise.

The next morning, the maid who entered to make up room 227 discovered Reed's body. Police officers described the scene. The body was lying face down on the bed wrapped in the bedding. Reed's face was bruised and had been bleeding and several teeth were dislodged. The police observed bloodstains on the pillowcase and a towel. The room had been ransacked, and Reed's wallet was missing. An autopsy determined that Reed died from aspiration of blood caused by the extensive bleeding from his mouth and nose.

The prosecution then offered into evidence the tape recording of defendant's confession. After determining that the confession was voluntary, the court admitted the tape. In his confession, defendant stated that he spoke to Reed in the Caravan Inn parking lot, decided at that time to rob Reed, and to kill Reed so he could get away with the robbery. Early in the morning Reed invited him to his room for beer. By this time both Reed and defendant had been drinking, and Reed was drunk. Defendant went to Reed's bathroom and passed out briefly while sitting on the toilet. When defendant emerged from the bathroom, he demanded Reed's money. Reed refused, and defendant struck him several times in the face, forcing Reed back onto the bed. Defendant then tried to strangle Reed, but Reed resisted and began yelling. Defendant then smothered Reed with a pillow until Reed died.[1] Defendant searched the room, taking Reed's wallet, which contained only $1.75, and three or four credit cards.

Police officers talked to defendant the next day, but made no arrest. Defendant promised to take a polygraph examination, but instead fled to Colorado. Two years later, following defendant's conviction for murders in Michigan, he waived extradition and was returned to California.

During the prosecution case, defendant asked no questions of witnesses and presented only one objection; he suggested that the court should admit the transcripts of the taped confession instead of listening to the tape itself. The court overruled the objection on the ground that the tape was the best evidence of the confession.

[1]Defendant's confession is not inconsistent with the autopsy report. As the pathologist testified, by placing a pillow over Reed's face defendant could have blocked the exit of blood from the wounds in Reed's mouth, thus in effect drowning Reed in his own blood.

When the prosecution rested its case, the court inquired whether defendant desired to present evidence. He replied "no." The court then addressed him: "I think it would be wise of me to advise you that on the tape, you had indicated to Officer Johnson your state of intoxication on the night in question and your mental state on the occasion of the incident is important and relevant. Do you desire to present any evidence in that regard at this time?" Defendant replied "No, I do not." Following a brief argument by the prosecutor, to which defendant did not reply, the court found defendant guilty of first degree murder.

Before beginning the special circumstance phase of the trial, the judge again warned defendant of the perils of self-representation; defendant again waived his right to representation by counsel and to trial by jury. The prosecutor then introduced evidence that defendant had been convicted of two second degree murders in Michigan, and proved that the elements of second degree murder under Michigan law are the same as under California law. The court then found a special circumstance, that the defendant had personally committed the acts causing death and had "been convicted in a prior proceeding of the offense of murder of the first or second degree" (Pen. Code, § 190.2), permitting capital punishment.[2]

At the commencement of the penalty phase the defendant again waived right to counsel and to trial by jury. The court admitted evidence relating to the murder of Mrs. Maxham in Michigan. That evidence showed that in October 1976, a year after the Reed murder, defendant rented a room from Maxham. On October 17, he became enraged when she criticized the condition of the room, beat her unconscious, and hanged her from the bedpost until she died. Defendant then took Maxham's money and fled to Florida, where he was apprehended. Defendant's taped confession also admitted the killing of Crane, his cellmate in the Michigan prison, and hinted that he had killed at least two other persons, a woman in California and a man in North Carolina.

Despite the advice of the court, defendant presented no evidence or argument on penalty. The court's opinion reviewed the aggravating factors—in particular the multiple murders and the lack of remorse—and found no mitigating factors, since defendant had declined to introduce evidence on intoxication or mental illness. The court sentenced defendant

---

[2]Defendant's appointed counsel in the trial court in a pretrial motion contended that the charged special circumstance should not apply to defendant because the alleged prior convictions referred to the two Michigan murders which were committed subsequent to the California murder. Defense counsel on appeal did not renew that contention, and in view of our disposition of this appeal it is not necessary for us to resolve it today.

to death. The sentencing court certified the complete record on appeal on August 18, 1978.

■■ ■■■ · On this automatic appeal, defendant is represented by counsel appointed by this court. Counsel raises only one significant issue relating to the guilt phase of the proceedings below; he contends that the court erred in permitting defendant to represent himself.[3] With regard to the special circumstance and penalty phases, counsel raises a number of contentions: (1) that the court again erred in permitting defendant to represent himself; (2) that the 1977 death penalty statute does not apply to antecedent crimes; (3) that application of the 1977 statute to defendant's crime would violate the ex post facto and equal protection clauses of the state and federal Constitutions; (4) that the death penalty provision of the 1977 statute violates the state constitutional provision prohibiting cruel or unusual punishment (Cal. Const., art. I, § 17); and (5) that the failure of the California statutes to grant appellate courts discretion to reduce death sentences to life imprisonment violates the Eighth Amendment to the United States Constitution. As we shall explain, we agree with counsel that the 1977 statute does not apply to a crime committed in 1975; that conclusion makes it unnecessary to consider defendant's other contentions relating to the special circumstance and penalty trials.

■ 2. *The guilt phase: the court did not err in permitting defendant to represent himself at the guilt trial.*

*Faretta* v. *California, supra,* 422 U.S. 806, established that a defendant competent to waive counsel has an affirmative right to represent

---

[3]Defense counsel raises two other contentions which relate to the guilt trial. First, he argues that the state's delay in bringing defendant to trial denied him due process of law. He notes that defendant first confessed to the Reed murder in December of 1976, but was not brought to California until January of 1978 and not tried until April 1978; the 1977 death penalty legislation took effect on August 11, 1977. Most of the delay, however, occurred while defendant was awaiting or undergoing trial in Michigan for two murders committed there. It is doubtful that Michigan would have agreed to turn defendant over to California until its own proceedings had terminated. Under these circumstances, we believe the delay prior to September 29, 1977, when defendant was convicted of the Michigan murders, was reasonable; the three-month further delay following the Michigan convictions did not prejudice defendant.

Defendant also argues that he was entitled to a postindictment preliminary hearing. Although *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916], granted an indicted defendant a right to a preliminary hearing, our opinion expressly stated that "the rule announced herein shall apply only to the present case and to those indicted defendants who have not entered a plea at the time this opinion becomes final." (22 Cal.3d at p. 594.) Since defendant Teron entered his plea before the *Hawkins* opinion became final, he cannot take advantage of our ruling in that case.

himself. ■ As we explained in *Ferrel* v. *Superior Court* (1978) 20 Cal.2d 888, 891 [144 Cal.Rptr. 610, 576 P.2d 93]: "A defendant in a criminal proceeding has a federal constitutional right to represent himself without counsel if, upon timely motion . . . , the trial court determines that he voluntarily and intelligently elects to do so. . . . If these conditions are satisfied, the trial court must permit an accused to represent himself without regard to the apparent lack of wisdom of such a choice and even though the accused may conduct his own defense ultimately to his own detriment." (20 Cal.3d at p. 891; see *People* v. *Wilks* (1978) 21 Cal.3d 460, 467-468 [146 Cal.Rptr. 364, 578 P.2d 1369].) (Citations omitted.) These principles apply to the trial of the guilt phase of a capital case. (See *Thomas* v. *Superior Court* (1976) 54 Cal.App.3d 1054, 1058 [126 Cal.Rptr. 830].)[4]

■ Before granting defendant leave to represent himself, the trial court must determine "whether the defendant has the mental capacity to waive his constitutional right to counsel with a realization of the probable risks and consequences of his action." (*Curry* v. *Superior Court* (1977) 75 Cal.App.3d 221, 226 [141 Cal.Rptr. 884]; *People* v. *Zatko* (1978) 80 Cal.App.2d 534, 544-545 [145 Cal.Rptr. 643]; see *People* v. *Lopez* (1977) 71 Cal.App.3d 568, 572-574 [138 Cal.Rptr. 36]; Silten & Tullis, *Mental Competency in Criminal Proceedings* (1977) 28 Hastings L.J. 1053, 1065-1069.) It is not, however, essential that defendant be competent to serve as counsel in a criminal proceeding (*Curry* v. *Superior Court, supra,* 75 Cal.App.3d 221, 226); "his technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." (*Faretta* v. *California, supra,* 422 U.S. 806, 836 [45 L.Ed.2d 562, 582].)

■ In *Faretta,* the Supreme Court, in holding that Faretta had a right to represent himself, observed that "The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." (422 U.S. at p. 835 [45 L.Ed.2d at p. 582].) The same description could be applied to defendant in the present case. Defendant Teron, who was literate, aware of his legal rights, and experienced in criminal proceedings, repeatedly and emphatically made clear his desire to represent himself. Interrogated at length by the trial court, Teron gave no indication in his replies that he was not competent to waive counsel. The trial court carefully and repeatedly warned defendant of the risks of self-representation; defendant acknowledged those risks and persisted in his course of action.

---

[4]The California decisions interpreting *Faretta* are reviewed in Yegan, *Faretta—The California Experience* (1978) 53 State Bar J. 384.

In maintaining that the court nevertheless erred in permitting defendant to represent himself, the state public defender raises two contentions. ■ First, he argues that the court should not have granted defendant's motion without a psychiatric evaluation of defendant. We agree with the Court of Appeal's observation in *People* v. *Lopez, supra,* 71 Cal.App.3d 568, 573, that: "If there is any question in the court's mind as to a defendant's mental capacity it would appear obvious that a rather careful inquiry into that subject should be made—probably by way of a psychiatric examination. It would be a trifle embarassing to get half way through a trial only to discover that a court has determined that a mentally deficient or seriously mentally ill person has been allowed to make a 'knowing and intelligent' decision to represent himself."

With the aid of hindsight, taking account of evidence introduced at all phases of the trial, we can discern facts which might create a question concerning the possibility of mental illness.[5] No such facts, however, were known to the court at the time of the *Faretta* hearing. Neither defendant nor the public defender suggested any basis for a psychiatric examination, and the court's interrogation of defendant revealed nothing suggestive of mental illness. In short, when it granted defendant's motion nothing in the record or known to the court suggested any factual basis which would give rise to any doubt respecting defendant's mental capacity. ■ " 'The determination of the trial judge as to the defendant's competence to waive counsel involves an exercise of discretion by the trial judge which in the absence of an abuse of discretion will not be disturbed on appeal.' " (*People* v. *Rhinehart* (1973) 9 Cal.3d 139, 147-148 [107 Cal.Rptr. 34, 507 P.2d 642]; see *People* v. *Elliott* (1977) 70 Cal.App.3d 984, 990 [139 Cal.Rptr. 205]; *Curry* v. *Superior Court, supra,* 75 Cal.App.3d 221, 227.) ■■■■ On the record before us we find no abuse of discretion in the court's failure to order a pretrial psychiatric examination.[6]

---

[5]Defendant's confession suggested that after committing the Reed and Maxham murders he may have attempted sexual acts upon the victims' bodies and then urinated on or in the vicinity of the bodies.

[6]A closer question is whether the trial judge should have perceived indicia of mental incapacity before the close of the guilt trial and suspended proceedings to permit a psychiatric examination of defendant. The trial court, during the guilt trial, heard defendant's confession, which included. discussion of defendant's peculiar conduct in connection with the murders, even though it did not admit much of the confession into evidence until the penalty trial. Thus when the prosecution rested its case at the guilt trial the court had some reason to suspect defendant's mental capacity, and would have acted within its discretion in requiring a psychiatric examination. We do not, however, believe the evidence of mental incapacity so compelling that the court's failure to interrupt proceedings to order such an examination rises to the level of an abuse of discretion.

■ Secondly, the state public defender argues that once it had become clear during the guilt trial that defendant did not intend to present a defense, the court should have revoked his right to represent himself. Defendant, however, bears no duty to present a defense. He has the right to plead guilty, even against the advice of counsel. (*People* v. *Vaughn* (1973) 9 Cal.3d 321, 327-328 [107 Cal.Rptr. 318, 508 P.2d 318].) A fortiori, having put the state to its proof, he has no obligation to try to rebut it. ■■■■ Thus the fact that defendant failed to present a defense does not demonstrate that he lacked the capacity to waive his right to counsel.[7]

■ 3. *The 1977 death penalty legislation does not apply to impose a death penalty for crimes committed before the effective date of that legislation.*

In 1973, the California Legislature enacted a statute imposing a mandatory death penalty for first degree murder whenever the trier of fact found that any one of a number of designated "special circumstances" was present; one of the special circumstances enumerated in the 1973 legislation embodied cases in which the defendant personally committed the acts causing death and in any prior proceeding had been convicted of murder. (Stats. 1973, ch. 719, § 5, p. 1300.) The 1973 statute was in effect on October 4, 1975, the date of the murder of Earl Reed. On December 7, 1976, however, under compulsion of intervening decisions of the United States Supreme Court,[8] we held that the procedures for imposition of the death penalty embodied in the 1973 legislation violated the United States Constitution. (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420 [134 Cal.Rptr. 650, 556 P.2d 1101].) Thus, when the state first

---

[7]The trial court's decision to permit defendant to represent himself in the special circumstance and penalty phases presents additional considerations not present at the guilt phase. In the first place, the court, having heard defendant's confession and observed his failure to offer any defense at the guilt phase, may have had grounds to reconsider defendant's mental competence to waive counsel. In the second place, the State of California asserts an independent interest in the accuracy of the special circumstance and penalty determinations. We do not, for example, permit a defendant to stipulate to the death penalty or to waive his right of automatic appeal. (See *People* v. *Stanworth* (1969) 71 Cal.2d 820, 833-834 [80 Cal.Rptr. 49, 457 P.2d 889].)

In view of our determination that no valid death penalty statute applied to defendant's 1975 crime, we need not decide whether the court erred in permitting self-representation at the special circumstance or penalty trials.

[8]See *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]; *Proffitt* v. *Florida* (1976) 428 U.S. 242 [49 L.Ed.2d 913, 96 S.Ct. 2960]; *Jurek* v. *Texas* (1976) 428 U.S. 262 [49 L.Ed.2d 929, 96 S.Ct. 2950]; *Woodson* v. *North Carolina* (1976) 428 U.S. 280 [49 L.Ed.2d 944, 96 S.Ct. 2978]; *Roberts* v. *Louisiana* (1976) 428 U.S. 325.[49 L.Ed.2d 974, 96 S.Ct. 3001].

filed charges against defendant in April of 1977, the State of California had no constitutional statute imposing the death penalty for the crime of which defendant was accused.

In August 1977, two years after the instant crime was committed, the Legislature enacted a new death penalty statute, effective August 11, 1977. (Stats. 1977, ch. 316, pp. 922-930.) In drafting the statute, the Legislature again enumerated a number of "special circumstances" —some similar to and some different from those embodied in the 1973 statute—under which a defendant, who had been found guilty of first degree murder, could be sentenced to death (Pen. Code, § 190.2); unlike the earlier death penalty statute invalidated in *Rockwell*, the new statute did not mandate the death penalty upon a finding that one of the special circumstances was present, but rather permitted the trier of fact to consider various aggravating or mitigating factors in determining whether capital punishment should be imposed in a particular case. (Pen. Code, § 190.3.) The new statute, in language similar to the 1973 statute, established as one "special circumstance" the fact that the defendant had personally committed the acts causing death and had "been convicted in a prior proceeding of the offense of murder of the first or second degree." (Pen. Code, § 190.2, subd. (c)(5).)

After the 1977 legislation became effective, the district attorney sought, and the grand jury returned, an indictment against defendant under the new death penalty law. Although defense counsel, prior to his removal at defendant's request, objected that the 1977 statute could not properly be applied to a 1975 crime, the trial court rejected the objections. Following the procedures and substantive provisions of the 1977 law, the court imposed a sentence of death.

As we explain, we have concluded that the trial court erred in applying the 1977 statute to a crime committed before the effective date of that enactment.

For more than a century, section 3 of the Penal Code has specifically provided that no provision of the code "is retroactive, unless expressly so declared." Although past decisions have held that this provision does not bar the retroactive application of amendatory legislation which mitigates or reduces the punishment for a crime (see, e.g., *In re Estrada* (1965) 63 Cal.2d 740, 746 [48 Cal.Rptr. 172, 408 P.2d 908]; *People* v. *Rossi* (1976) 18 Cal.3d 295 [134 Cal.Rptr. 64, 555 P.2d 1313]), our courts have pronounced that the canon of construction embodied in section 3 fully applies to penal measures which increase the punishment

for particular crimes. (See, e.g., *Sekt* v. *Justice's Court* (1945) 26 Cal.2d 297, 308-309 [159 P.2d 17, 167 A.L.R. 833]; *In re Estrada, supra,* 63 Cal.2d 740, 747-748; *People* v. *Daniels* (1963) 222 Cal.App.2d 99, 101 [34 Cal.Rptr. 844]; see also *White* v. *Brown* (9th Cir. 1972) 468 F.2d 301, 303.)

In the instant case, the Legislature, in enacting the 1977 legislation, undoubtedly intended to increase the punishment for first degree murder committed under particular circumstances. As we have seen, prior to that enactment no constitutional death penalty statute in California generally applied to cases of first degree murder. The Legislature, in considering the measure, debated both the wisdom and morality of imposing the death penalty in any circumstance as well as the question of which particular "special circumstances" were sufficiently grave to permit the imposition of death as a sanction. In enacting the measure, the Legislature unquestionably believed that it was increasing the punishment that could be imposed on persons committing the crimes enumerated in the statute. Indeed, the Legislature specifically enacted the statute as an urgency measure because of its professed belief that the increased sanctions permitted by the new law were necessary for the immediate protection of the public. Consequently, the principle that statutes which increase the punishment for crime will be construed to apply only to crimes committed after their enactment governs the interpretation of the 1977 legislation, and precludes its retroactive application.

The Attorney General, seeking to avoid that conclusion, argues that the 1977 legislation should be regarded as simply a "procedural" measure that did not alter the substantive elements or punishment for criminal behavior, but rather merely changed the procedure under which existing crimes were to be tried. On this theory, the Attorney General argues that, like other statutes affecting only procedure, the 1977 legislation could be applied in this case since the trial in this matter occurred after the effective date of the legislation. (See *People* v. *Ward* (1958) 50 Cal.2d 702 [328 P.2d 777]; *People* v. *Snipe* (1972) 25 Cal.App.3d 742, 746 [102 Cal.Rptr. 6, 60 A.L.R.3d 1316].)

We find the Attorney General's characterization of the 1977 legislative action is wholly unrealistic. Absolutely nothing in the legislative history suggests that the Legislature, in considering this controversial and highly charged legislation, believed that it was engaged in the mundane task of regulating criminal procedure. On the contrary, exchanges both in the Legislature itself, and between the Legislature and the Governor, abundantly show that the legislation at issue was involved in vitally

substantive policy considerations, concerning the appropriateness of enacting criminal measures authorizing *anew* the imposition of capital punishment in California. Under these circumstances, we believe that the legislation cannot be characterized as simply a "procedural" measure.[9]

■ We recognize that in *Dobbert* v. *Florida* (1977) 432 U.S. 282 [53 L.Ed.2d 344, 97 S.Ct. 2290], a majority of the United States Supreme Court indicated that, for purposes of the ex post facto clause of the federal Constitution, a Florida statute in some respects similar to the 1977 California legislation could be considered a "procedural" or "ameliorative" enactment. In *Dobbert*, however, the Supreme Court was not faced with the question—as we are today—of whether, as a matter of statutory interpretation, a penal measure should be interpreted to apply to offenses committed prior to the effective date of the legislation. In *Dobbert*, at the time the case reached the United States Supreme Court, the Florida Supreme Court had already determined that as a matter of state law the subsequent legislation applied to Dobbert's previously committed offense (*Dobbert* v. *State* (Fla. 1976) 328 So.2d 433). Thus, the United States Supreme Court was concerned only with the constitutionality under the federal ex post facto clause of that retroactive application. We are not apprised of what circumstances led the Florida court to its conclusion, but, for the reasons discussed above, we are convinced that the 1977

---

[9]Citing *In re Marriage of Bouquet* (1976) 16 Cal.3d 583 [128 Cal.Rptr. 427, 546 P.2d 1371], the Attorney General argues that because the 1977 legislation was enacted to cure constitutional defects in the 1973 statutes, it should be given retroactive effect. In *Bouquet*, we faced the quite different question whether to apply amended Civil Code section 5118, which provided that the earnings of both spouses while living apart were separate property, or former section 5118 under which only the wife's earnings were separate property. Noting that former section 5118 was constitutionally questionable, we stated that "We may reasonably infer . . . that the Legislature wished to replace the possibly infirm law with its constitutionally unobjectionable successor as soon as possible . . . [and thus] intended the amendment to have retroactive effect. . . . While this inference is hardly conclusive, it is of some value in ascertaining the Legislature's intent." (16 Cal.3d 583, 588.)

*Bouquet* is clearly distinguishable from the present case on a number of grounds. First, and most significantly, *Bouquet* did not involve a penal statute that imposed new and additional sanctions pursuant to new provisions; rather, it involved a statute concerned simply with the adjustment of property rights between married, but separated, persons. Thus, the fundamental principle of statutory construction, embodied in Penal Code section 3, which negates any retroactive operation of new penal sanctions was not applicable in that case.

Furthermore, *Bouquet* presented the court with only two alternatives: to apply the former, probably unconstitutional law or to apply the amended, constitutional law. In such a case, our court could reasonably infer that the Legislature intended the latter to apply. In the case at bar however, the inapplicability of the 1977 law does not leave the state with no criminal sanctions against defendant. Defendant, like all other persons who committed first degree murder prior to the enactment of the 1977 legislation, is subject to a sentence of life imprisonment as provided by the criminal statutes in effect at the time of the commission of the offense.

California legislation was intended to increase the available criminal punishment with respect to the "special circumstances" enumerated in the enactment. Consequently, the United States Supreme Court's decision in *Dobbert* is inapposite to the present matter.

In sum, we think a realistic view of the matter clearly demonstrates that the trial court erred in applying the 1977 legislation to an offense committed in 1975. The 1977 Legislature was, of course, well aware of the 1976 United States Supreme Court decisions (see fn. 8, *ante*) and this court's decision in *Rockwell* v. *Superior Court, supra,* and recognized that California law embodied no valid death penalty provision applicable in first degree murder cases. The Legislature set out to enact a new death penalty statute, thereby increasing the penalty for those first degree murders in which it believed death might be an appropriate sanction. Although California precedent and statutory canons of construction established that in the absence of explicit language to the contrary the judiciary would not apply the new legislation to antecedent crimes, the Legislature included no provision declaring that the new enactment would apply to previously committed offenses. Under these circumstances, we conclude that the statute may not properly be interpreted to apply to crimes committed before August 11, 1977. Defendant must be sentenced in accordance with the constitutionally valid provisions of the applicable criminal statute in effect at the time of the commission of the offense. (See, e.g., *People* v. *Murphy* (1972) 8 Cal.3d 349, 368 [105 Cal.Rptr. 138, 503 P.2d 594]; *Rockwell* v. *Superior Court, supra,* 18 Cal.3d 420, 445.)

In light of our conclusion that the 1977 death penalty legislation is not applicable to the instant case, we, of course, have no occasion to pass on the constitutional validity of that or any subsequent legislation.

The judgment against defendant is modified to provide for a sentence of life imprisonment and, as so modified, is affirmed.

Bird, C. J., Mosk, J., Manuel, J., and Newman, J., concurred.

**RICHARDSON, J.**—I concur in the judgment. On October 4, 1975, when defendant committed the brutal crime for which he was convicted, no valid death penalty law existed in this state. The 1973 legislation which had imposed a mandatory sentence of death under compulsion of the United States Supreme Court decision in *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909], was held by us in 1976 to be

invalid because of its failure to provide adequate standards to guide the sentencing authority in its determination whether or not to impose the ultimate sanction. (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 428, 445 [134 Cal.Rptr. 650, 556 P.2d 1101].)

The 1977 legislation, which was enacted to remedy the defects in the 1973 statute, was made effective "immediately in order to guarantee the public the protection inherent in an operative death penalty law." (Stats. 1977, ch. 316, § 26.) The operative date of the 1977 death penalty law was August 11, 1977. I do not know whether the Legislature intended the statute to apply to crimes committed before August 11, 1977. Similarly, I do not know, as contended by the dissent, "that the Legislature intended the 1977 death penalty statute to have retroactive effect." (*Post,* p. 126.) What is certain is that nowhere in the 26 sections of the enabling act (Stats. 1977, ch. 316) nor in the statutory amendments, is there any provision which purports to apply the new law retroactively to crimes which were committed before its enactment. What is equally clear is that section 3 of the Penal Code provides that *no part of the Penal Code "is retroactive, unless expressly so declared."* (Italics added.)

It is argued that section 3 must be interpreted in accordance with our reasoning in *In re Estrada* (1965) 63 Cal.2d 740, 746 [48 Cal.Rptr. 172, 408 P.2d 908], and in *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587-588 [128 Cal.Rptr. 427, 546 P.2d 1371]. While it is true that *Estrada* (a conviction for escape without force or violence after conviction of being under the influence of narcotics, a misdemeanor) and *Bouquet* (a marriage dissolution case involving the nature of earnings and accumulations of a husband after separation from his wife) have some application, in my opinion a death penalty case is unique in the law. It is *sui generis.* In a capital case broad abstract principles lifted from other contexts have less persuasive force. This is because the ultimate punishment, of course, is fixed, final and irrevocable permitting no margin for error. I find no provision of the 1977 death penalty law which "expressly" declares that it is to be given retroactive effect.

Focusing on the intent of the Legislature, therefore, I conclude that it is not clear that the Legislature by providing that the death penalty law was to *"go into immediate effect"* means that the law was to apply to crimes *previously* committed.

The holding in this case affects only a limited number of persons, namely, those whose offenses were committed before August 11, 1977, the

effective date of the 1977 death penalty legislation. The constitutionality of the 1977 law is not before us.

**CLARK, J.,** Dissenting.—The majority make the following argument for refusing to uphold the trial court's judgment imposing the death penalty upon defendant.

While the Legislature is presumed to intend an amendatory statute mitigating or reducing punishment be applied retroactively, the Legislature is presumed to intend an amendatory statute increasing punishment be applied only prospectively. (See, e.g., *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 908].) The majority contend the 1977 statute increased the punishment for defendant's crime. Therefore, they reason, the Legislature must be presumed to have intended the statute be limited to future application.

The flaw in the majority's argument is that the 1977 statute does *not* increase the punishment, but rather mitigates the penalty for defendant's crime. Defendant's crime is first degree murder by one having personally committed the acts causing death and having "been convicted in a prior proceeding of the offense of murder of the first or second degree." (Pen. Code, § 190.2.) In 1975, when defendant committed the crime, it was punishable by a *mandatory* penalty of death. (Former § 190.2, added by Stats. 1973, ch. 719, § 5, and repealed by Stats. 1977, ch. 316, § 8.) The 1977 statute *mitigated* the punishment for defendant's crime by providing for life imprisonment without possibility of parole as an alternative to the previously mandatory death penalty. (§ 190.2, added by Stats. 1977, ch. 316, § 9.) Therefore, we must presume the Legislature intended the 1977 statute to apply retroactively.

"Consistent with *Estrada's* mandate, we must address 'all pertinent factors' when attempting to divine the legislative purpose. A wide variety of factors may illuminate the legislative design, 'such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.' " (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587-588 [128 Cal.Rptr. 427, 546 P.2d 1371], quoting *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].)

In criminal cases generally, but in death penalty cases especially, we have tended to lose sight of the "evils to be remedied" by the challenged legislation. In order to faithfully implement the intent of the Legislature

in this case, we must remind ourselves of the evil to be remedied by a death penalty statute. There is no better way of doing so than by review of the facts of this case.

## FACTS

In 1975, in Anaheim, defendant brutally murdered Earl Reed for $1.75. Reed choked on his own blood after defendant first beat and then smothered him. When defendant went to Reed's room that night he intended, by his own admission, to rob Reed and then murder him "just so I could get away with" the robbery. Defendant had, he admitted, no other motive for killing Reed.

In 1977, prior to defendant's trial for the Reed murder, defendant was convicted of two other murders in Michigan. One of his Michigan victims was Norma Maxham, a 75-year-old woman from whom he rented a room. When Mrs. Maxham asked defendant to move out of the room he beat her until she was unconscious, tore off her clothes, bound her with electrical cord and hanged her by the neck. After waiting until he was certain of his victim's death, defendant left the house to buy pizza and beer. He returned to the room and, in the presence of the still hanging corpse, ate the pizza, drank the beer, took a shower and watched a football game on television.

While in jail in Michigan awaiting trial for the Maxham murder, defendant hanged a fellow inmate.

Defendant admits having committed at least two other murders, but states he has no idea of the total number of persons he has killed. He explains his incomplete recall by comparing the act of murder to drinking a cup of coffee. A month from now, defendant notes, one is not likely to remember having drunk a cup of coffee today.

Defendant claims he can easily make a knife while in jail, and will knife a guard if given the opportunity. Nothing the prison officials can do will deter him, defendant insists. If released from jail, defendant intends to return to his "everyday type of life."

This is the person the majority free from the gas chamber—modifying his sentence to life imprisonment *with possibility of parole*—by imputing to the Legislature the intention not to have the 1977 death penalty statute apply retroactively.

A review of the recent history of death penalty legislation in California reveals the utter absurdity of the majority's conclusion.

## LEGISLATIVE HISTORY

On 18 February 1972, a majority of this court held the death penalty violative of the cruel or unusual punishment prohibition of article I, section 6 (now § 17) of the California Constitution on the grounds it offended contemporary standards of decency and was no longer commonly practiced by civilized societies. (*People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].)

Nine months later, in the general election of 7 November 1972, the people of California repudiated this court's assessment of contemporary standards. Proposition 17—an initiative measure nullifying *Anderson* by amending the California Constitution to expressly provide that the death penalty does not constitute cruel or unusual punishment as that term is used in our charter—was approved by 67 percent of the voters.[1]

This direct expression of the people's will was thwarted, however, by the intervening decision of the United States Supreme Court striking down the death penalty statutes of Georgia and Texas on the ground they violated the federal Constitution's prohibition against cruel and unusual punishment. (*Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].)

"Those states wishing to reenact capital punishment studied *Furman,* of course, to determine what, specifically, had rendered the Georgia and Texas statutes unconstitutional. Because each of the nine justices wrote a separate opinion in that case, and none spoke for the court, certainty was not possible. However, the consensus in the legal community was that the high court disapproved of death penalty statutes conferring discretion upon the sentencing authority, and that the court would uphold legislation which eliminated the element of discretion by making the death penalty mandatory for certain offenses. Subscribing to this interpretation of *Furman,* California enacted a 'mandatory' capital punishment system." (*Rockwell* v. *Superior Court* (1976) 18 Cal.3d 420, 446 [134 Cal.Rptr. 650, 556 P.2d 1101] (Clark, J., conc.).)

[1]Section 27, added to article I of the Constitution by Proposition 17, provides: "All statutes of this state in effect on February 17, 1972, requiring, authorizing, imposing, or relating to the death penalty are in full force and effect, subject to legislative amendment or repeal by statute, initiative or referendum. [¶] The death penalty, provided for under those statutes shall not be deemed to be, or to constitute, the infliction of cruel or unusual punishments within the meaning of Article I, Section 6 nor shall such punishment for such offenses be deemed to contravene any other provision of this constitution."

California's good faith effort to provide for capital punishment without infringing on constitutional prohibitions was frustrated, however, by the high court's failure to make itself understood in *Furman.* In *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] and its companion cases, more than four years after its *Furman* decision, the Supreme Court made it clear that "statutes providing for imposition of the death penalty may neither make that penalty mandatory nor give the jury or judge charged with determining the penalty absolute discretion in the choice of life or death, but must provide standards so that the sentencing authority will 'focus on the particularized circumstances of the crime and the defendant.' " (*Rockwell* v. *Superior Court, supra,* 18 Cal.3d at p. 428, quoting *Gregg* v. *Georgia, supra,* 428 U.S. at p. 199 [49 L.Ed.2d at p. 889].)

The death penalty statute California enacted in 1973 in reliance on the prevailing but mistaken interpretation of *Furman* did not, of course, satisfy the test later enunciated in *Gregg.* "We conclude therefore that because sections 190 through 190.3 make death a mandatory punishment for those categories of first degree murder encompassed by the special circumstances enumerated in section 190.2, without provision for consideration of evidence of mitigating circumstances as to the offense or in the personal characteristics of the defendant, and afford no specific detailed guidelines as to the relevance of such evidence in determining whether death is an appropriate punishment, they permit arbitrary imposition of the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution." (*Rockwell* v. *Superior Court, supra,* 18 Cal.3d at p. 445.)

The holding of *Rockwell* is crystal clear: "Those provisions which establish *procedures* for imposition of the death penalty are therefore invalid and petitioner may not be required to stand trial thereunder." (18 Cal.3d at p. 445, italics added.)

In response to *Rockwell,* the Legislature passed and sent to the Governor Senate Bill No. 155 (Stats. 1977, ch. 316) remedying the procedural defects in the prior legislation. The bill was vetoed by the Governor on 27 May 1977, but the veto was overridden and the statute was filed and became effective on 11 August 1977.

A postscript to this history of California's long struggle to protect its citizens with an operative death penalty was provided by the General Election of 7 November 1978. Proposition 7, an initiative measure extending the death penalty to other categories of first degree murder,

was approved by 72 percent of the voters, an even more overwhelming majority than nullified *Anderson* by approving Proposition 17.

## LEGISLATIVE INTENT

By enacting the 1973 statute the Legislature manifested its determination that a mandatory death penalty is the appropriate punishment for defendant's crime. Because mandatory death penalty statutes were declared unconstitutional in the interim, the Legislature in 1977 made defendant's crime punishable by either death or life imprisonment without possibility of parole, depending upon consideration of aggravating and mitigating circumstances. The Legislature's intentions in enacting the 1977 statute were clearly stated in the urgency clause. "The California Supreme Court has declared the existing death penalty law unconstitutional. This act remedies the constitutional infirmities found to be in existing law, and must take effect immediately in order to guarantee the public the protection inherent in an operative death penalty law." (Stats. 1977, ch. 316, § 26.)

To draw from the historical record the conclusion that the Legislature in enacting the 1977 statute intended to repeal the death penalty as to crimes committed prior to the effective date of the amendatory legislation is, again, utterly absurd.

The applicable principles of statutory construction certainly do not suggest such a conclusion. As the majority note, section 3 of the Penal Code states that no provision of the code "is retroactive, unless expressly so declared." However, as this court made clear in *In re Estrada, supra,* 63 Cal.2d 740, 746: "That section simply embodies the general rule of construction, coming to us from the common law, that when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively. That rule of construction, however, is not a straitjacket. Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent. It is to be applied only after, considering all pertinent factors, it is determined that it is impossible to ascertain the legislative intent."

As noted previously, in *Marriage of Bouquet* this court stated: "Consistent with *Estrada's* mandate, we must address 'all pertinent factors' when attempting to divine the legislative purpose. A wide variety

of factors may illuminate the legislative design, 'such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.' " (*In re Marriage of Bouquet, supra,* 16 Cal.3d at pp. 587-588, quoting *Alford* v. *Pierno, supra,* 27 Cal.App.3d at p. 688.) Consideration of many of these factors has already been shown to lead inescapably to the conclusion that the Legislature intended the 1977 death penalty statute to have retroactive effect. Another factor leading to the same conclusion was discussed in *Bouquet*: the presumption that an amendment to cure constitutional defects in a statute is intended to apply retroactively.

In *Bouquet,* as the majority state, we faced the "question whether to apply amended Civil Code section 5118, which provided that the earnings of both spouses while living apart were separate property, or former section 5118 under which only the wife's earnings were separate property." (*Ante,* p. 118, fn. 9.) "The probable constitutional infirmity of the former law," we noted, "does lend some support to the conclusion that the Legislature intended the amendment to have retroactive effect. We assume that the Legislature was aware of judicial decisions; we thus assume that the Legislature knew of the dubious constitutional stature of the sexually discriminating old law. We may reasonably infer, therefore, that the Legislature wished to replace the possibly infirm law with its constitutionally unobjectionable successor as soon as possible." (16 Cal.3d at p. 588, citation omitted.)

The element of speculation, which deprived the argument of some of its force in *Bouquet,* is entirely absent here. While former Civil Code section 5118 was arguably unconstitutional, the 1973 death penalty statute had been expressly so declared by this court. It was necessary in *Bouquet* to assume that the Legislature was aware of judicial decisions and, thus, aware of the dubious constitutionality of former section 5118. In this case, however, the Legislature expressly stated that it was acting because "The California Supreme Court has declared the existing death penalty law unconstitutional." (Stats. 1977, ch. 316, § 26.) Finally, in *Bouquet* the conclusion that the Legislature intended the constitutionally unobjectionable new law to take effect "as soon as possible," that is, to have retroactive effect, was a matter of inference. In this case, again, the Legislature expressly so stated: "This act remedies the constitutional infirmities found to be in existing law, and must take effect immediately in order to guarantee the public the protection inherent in an operative death penalty law." (*Id.*)

The majority seek to distinguish *Bouquet* on two grounds. First, they note that "the fundamental principle of statutory construction, embodied in Penal Code section 3, which negates any retroactive operation of new penal sanctions was not applicable in that case" because it involved a civil statute governing the property rights of married, but separated, persons. (*Ante,* p. 118, fn. 9.) This distinction clearly fails in light of section 3 of the Civil Code, the word-for-word counterpart of section 3 of the Penal Code, which provides that no part of the Civil Code "is retroactive, unless expressly so declared."

The second attempted distinction: In *Bouquet* this court was faced with the alternative of applying the former, arguably unconstitutional law or the amended, constitutional law. "In the case at bar, however, the inapplicability of the 1977 law does not leave the state with no criminal sanctions against defendant. Defendant, like all other persons who committed first degree murder prior to the enactment of the 1977 legislation, is subject to a sentence of life imprisonment as provided by the criminal statutes in effect at the time of the commission of the offense." (*Ante,* p. 118, fn. 9.)

What the majority are saying, in effect, is that life imprisonment *with possibility of parole* affords Californians adequate protection from men like Gregory Teron. But Californians disagree. As previously stated, the Legislature expressly declared the 1977 statute "must take effect immediately in order to guarantee the public the protection inherent in an operative death penalty law." When this court declared capital punishment unconstitutional in *Anderson,* the people directly nullified that decision by approving Proposition 17. When intervening decisions of the United States Supreme Court indicated the probable invalidity of the existing statute under the federal Constitution, the Legislature enacted the 1973 death penalty statute. When that statute was declared unconstitutional in *Rockwell,* the Legislature enacted the 1977 statute. Finally, not entirely satisfied with the extent of the protection afforded them by the 1977 statute, the people last year approved Proposition 7.

We now return to the principle of statutory construction with which we began this discussion: While the Legislature is presumed to intend an amendatory statute mitigating or reducing punishment be applied retroactively, the Legislature is presumed to intend an amendatory statute increasing punishment be applied only prospectively.

The ground for this distinction is clear. The constitutional prohibition against ex post facto laws prevents application of an amended statute

increasing punishment to crimes previously committed, but does not prevent application to such crimes of an amended statute mitigating or reducing punishment. (See, e.g., *People* v. *Ward* (1958) 50 Cal.2d 702 [328 P.2d 777].) The Legislature is presumed not to intend to enact a statute offending the Constitution. (*City of Los Angeles* v. *Belridge Oil Co.* (1957) 48 Cal.2d 320, 324 [309 P.2d 417].) Therefore, an interpretation must be adopted which, consistent with the statute's language and purpose, eliminates doubts as to its constitutionality. (*In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142].)

That the ex post facto prohibition is at the foundation, analytically, of the *Estrada* doctrine is apparent from even the most casual reading of the cases in that line of authority. In the seminal case of *Sekt* v. *Justice's Court* (1945) 26 Cal.2d 297 [159 P.2d 17, 167 A.L.R. 833], for example, this court, considering "the legal effect of an amendatory act increasing the punishment," cited with approval "substantial and well-reasoned authority to the effect that where the later statute increases the punishment the Legislature has clearly demonstrated its intent that the act should be punished, and since the offender cannot be punished under the new law because of the *ex post facto* provision of the Constitution, he will be held under the old law." (*Id.,* at p. 307.)

We ask ourselves, therefore, the following question: Did the Legislature have reason to believe the 1977 statute increased the punishment for defendant's crime within the meaning of the ex post facto clause?

The answer to that question is clearly "No." The Legislature completed its action on the 1977 statute by overriding the Governor's veto on 11 August 1977. Nearly two months earlier, on 17 June 1977, the United States Supreme Court filed its decision in *Dobbert* v. *Florida* (1977) 432 U.S. 282 [53 L.Ed.2d 344, 97 S.Ct. 2290]. In *Dobbert* the high court held that functionally equivalent changes in Florida's death penalty statute between the time of the trial and the time of the murder were procedural and on the whole ameliorative, and thus not in violation of the prohibition against ex post facto laws. As previously stated, the Legislature is presumed to be aware of judicial decisions. (*In re Marriage of Bouquet, supra,* 16 Cal.3d at p. 588.) Certainly the Legislature's awareness of United States Supreme Court decisions bearing on the constitutionality of capital punishment is beyond question. Therefore, we must presume the Legislature, knowing that retroactive application of the 1977 statute

would not violate the ex post facto clause, intended the legislation to have retroactive effect.[2]

The *Dobbert* opinion deserves further attention because it so clearly exposes the flaw in the majority's argument. The majority recognize that while the 1973 statute provided a mandatory death penalty for defendant's crime, the 1977 statute made his crime punishable by death or life imprisonment without possibility of parole, depending upon consideration of aggravating and mitigating circumstances. They nevertheless conclude that the 1977 statute increased the penalty for defendant's offense. This conclusion is based on the assumption that, the 1973 statute having been declared unconstitutional in 1976, no death penalty was in effect for purposes of ex post facto analysis when defendant committed his crime in 1975. Such an analysis was rejected in *Dobbert* as a "sophistic argument [which] mocks the substance of the *Ex Post Facto* Clause."

"Petitioner's second *ex post facto* claim is based on the contention that at the time he murdered his children there was no death penalty 'in effect' in Florida. This is so, he contends, because the earlier statute enacted by the legislature was, after the time he acted, found by the Supreme Court of Florida to be invalid under our decision in *Furman* v. *Georgia,* 408 U.S. 238 (1972). Therefore, argues petitioner, there was no 'valid' death penalty in effect in Florida as of the date of his actions. But this sophistic argument mocks the substance of the *Ex Post Facto* Clause. Whether or not the old statute would, in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.

"Petitioner's highly technical argument is at odds with the statement of this Court in *Chicot County Dist.* v. *Baxter State Bank,* 308 U.S. 371, 374 (1940): 'The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence

---

[2]My discussion has throughout been limited to the "special circumstances" involved in defendant's crime. The 1977 statute added two other special circumstances not covered by the earlier legislation: (1) Willful, deliberate and premeditated murder perpetrated by means of a destructive device or explosive. (Pen. Code, § 190.2, subd. (b).) (2) Willful, deliberate and premeditated murder involving infliction of torture. (Pen. Code, § 190.2, subd. (c)(4).) Whether the Legislature intended either of these provisions to have retroactive effect is a question not before us, and as to which I express no opinion.

affording no basis for the challenged decree. [Citations.] It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored.' Here the existence of the statute served as an 'operative fact' to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder. This was sufficient compliance with the *ex post facto* provision of the United States Constitution." (*Dobbert* v. *Florida, supra,* 432 U.S. at pp. 297-298 [53 L.Ed.2d at pp. 358-359].)

The citizens of California sent this court a message in 1972 when they nullified *Anderson* by approving Proposition 17. By amending our charter to provide that the death penalty does not constitute cruel or unusual punishment or "contravene any other provision of this constitution," our people indicated with unmistakable clarity that they consider capital punishment necessary to their safety and well being, and that this court is not to thwart their will in this regard. We cannot ignore that message without forfeiting their confidence.

The judgment convicting defendant of first degree murder and imposing the penalty of death should be affirmed without modification.

Respondent's petition for a rehearing was denied February 8, 1979. Clark, J., was of the opinion that the petition should be granted.