# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
BILLY RAY WALDON,
Defendant and Appellant.

S025520

San Diego County Superior Court
CR 82986

January 23, 2023

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Cantil-Sakauye[*] concurred.

---

[*]    Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. WALDON

S025520

Opinion of the Court by Liu, J.

A jury convicted Billy Ray Waldon of three counts of first degree murder (Pen. Code, § 187; all undesignated statutory references are to this code) and several other crimes: attempted murder (§§ 187, 664); arson (§ 451); forcible oral copulation and sexual penetration (former §§ 288a, 289, subd. (a)); rape (§ 261); two counts of burglary (§ 459); vehicle theft (Veh. Code, § 10851, subd. (a)); seven counts of robbery (§ 211); carrying a loaded firearm, an illegal switchblade knife, and a concealed dirk or dagger (former §§ 12031, subd. (a), 653k, 12020, subd. (a)); and two counts of animal cruelty (§ 597, subd. (a)).  The jury found true the special circumstances of multiple murders (§ 190.2, subd. (a)(3)), murder during the commission of burglary and robbery (former § 190.2, subd. (a)(17)(i), (vii)) and murder to avoid arrest (§ 190.2, subd. (a)(5)), and it returned a verdict of death.  Waldon's appeal is automatic.  (§ 1239, subd. (b).)

Because of errors in granting Waldon's request to represent himself, we must reverse Waldon's conviction and sentence.

## I.    FACTUAL BACKGROUND

## A.  Guilt Phase

### 1. *Prosecution case*

The prosecutor presented evidence that Waldon committed a series of crimes in the San Diego area over a two-week period in December 1985.

Dawn Ellerman and her daughter Erin Ellerman were

killed in their home, which had been burned by an intense fire. Autopsies showed that the mother died of a gunshot wound before the fire and the daughter died of smoke inhalation. Investigators concluded the fire was set intentionally, and a relative testified that the Ellerman's computer was missing. A witness testified that she saw a man running out of the Ellerman house as it was burning and identified Waldon as the man she had seen.

Erin Lab testified that a man carrying a gun and wearing a dark ski mask broke into her apartment, ransacked the apartment, and raped her. At a lineup after his arrest the following summer, Lab identified Waldon as her assailant.

Four women testified about being robbed by a man in a dark ski mask: Carol Franklin, Nancy Ross, Diane Thomas, and Julia Meredith each had her purse stolen in the separate incidents. Thomas and Meredith later identified Waldon as the man who robbed them.

Responding to the last of these crimes, the Meredith robbery, police pursued a man in a blue Honda who drove over medians and onto the wrong side of the road as he sped away from them. Stopping with a flat tire, the man ran from his car and evaded the police. One of the officers later identified Waldon in a lineup as the driver who fled. In the Honda, which was registered to Waldon, police found a box of bullets as well as identification and other documents bearing Waldon's name. Police also found the Ellermans' computer in the car, along with other items belonging to the Ellermans, to Erin Lab, and to Franklin, Ross, Thomas, and Meredith.

Nearby, just after the police chase, a man in a ski mask confronted Gordon Wells as he was working on a car. The man

shot and killed Wells, and shot and wounded John Copeland, a neighbor who heard shots and went to assist Wells. At a lineup, Copeland tentatively identified Waldon as the shooter.

A ballistics expert testified that bullet fragments retrieved from Dawn Ellerman and Gordon Wells were fired from the same gun and were consistent with the ammunition found in Waldon's car.

One morning in June of the following year, Daniel Roman discovered that his 1965 Mustang was missing. Later that day, a driver in a car matching the description of Roman's sped away from police and fled on foot when they tried to stop him for a Vehicle Code infraction. Police apprehended and arrested the man, who gave his name as "Stephen Midas" but was later identified as Waldon.

### 2. Defense case

Waldon represented himself at trial. His defense was that federal agents framed him for the charged crimes to thwart his efforts to promote world peace, spread new languages, and advance Cherokee autonomy.

Waldon testified that his grandfather was part Cherokee. After Waldon's discharge from the Navy in 1984, he founded several organizations: the World Humanitarian Church; the World Esperanto Organization; the World Poliespo Organization; the United Nations of Autonomous People; and the Exiled Government of the Cherokee Nation. Waldon claimed that Poliespo was a "rapid thinking" language that he invented by combining Esperanto, an international language, and Cherokee. Waldon also founded the Cherokee Bicycle Company to market a special bicycle to benefit Cherokee people.

Waldon claimed that he met a man named Mark Williams who kept appearing in various locations in Italy, Germany, and California, where Waldon was pursuing his education and activism. Waldon believed that Williams and another man were CIA agents who were monitoring him. Waldon testified that he tape-recorded some of his conversations with Williams but the tapes and other evidence proving Waldon's innocence had been in a storage unit and were destroyed after he stopped paying the rental fee.

Waldon testified that in late December 1985, he went to Imperial Beach to meet with Williams, who expressed interest in purchasing a bicycle from Waldon. Men wearing ski masks and shirts that said "Federal Agent" joined Williams in beating Waldon; they cursed Poliespo and Waldon's promotion of Indian autonomy. The men bound Waldon, took him away in their van, and kept him chained to a chair with a plastic hood over his head. Waldon managed to escape but learned from a news article that he was wanted for murder. He lived as a fugitive in a crawl space under a house in Imperial Beach, fearing that he would be convicted despite his innocence if he turned himself in.

According to Waldon's testimony, in June 1986, Williams and two other men found Waldon in his crawl space and kidnapped him again. Later, as the men were forcing him into a Mustang, Waldon was able to drive away and escape. When police tried to pull him over, Waldon drove away and then got out of the car and ran. As he ran, he threw down a gun he claimed Williams put in his clothing. Waldon denied any involvement in the charged crimes.

An inmate from the San Diego jail, Erwin Spruth, testified that he met Waldon in December 1985, before either had been

4

arrested. Spruth noticed there was very little in the back of Waldon's Honda; he did not see the computer or suitcase that police later recovered from the car and identified as belonging to the Ellermans. A few days after Christmas, Spruth received a call from Mark Williams, who was looking for Waldon.

Birgitta Holenstein Sequoyah testified that she was Waldon's wife. She met him in San Francisco in July 1985 after overhearing a conversation between Waldon and Williams about American Indian autonomy. She was with Waldon when he went to meet with Williams. Holenstein stayed in the car at first but then followed Waldon and saw him being beaten by Williams and two other men in dark ski masks and shirts indicating they were federal agents. She heard one of the agents curse Waldon's involvement in Cherokee autonomy and Poliespo. She ran away but later saw Williams take Waldon's car and drive away in it. She never saw a computer, suitcase, purses, or a gun in Waldon's car.

Answering similar questions about his honesty and nonviolence, Holenstein and Spruth testified to Waldon's good character, as did Waldon's second wife, aunt, childhood friend, another inmate from the San Diego jail, and several people who knew Waldon from his attendance at Esperanto conferences.

An eyewitness to the police pursuit of Waldon's vehicle testified to the position of officers when the suspect fled, indicating that the suspect may have been out of sight of the officers. A city employee testified about the location of stop signs on the route of the chase, contradicting the description of a pursuing officer. And an expert explained factors that diminished the accuracy of eyewitness identification, including observing a person when he is running, during periods of high

stress or danger, and when distinctive features are obscured, for example, by a ski mask.

### 3. *Prosecution rebuttal*

In rebuttal, the prosecutor presented testimony from additional officers, who described the pursuit of Waldon's vehicle, and from Waldon's first wife, who testified that Waldon stole and lied when it suited him and made a game of trying to get away with it.

## B. Penalty Phase

The prosecutor presented evidence connecting Waldon to crimes committed in Oklahoma between November 15 and 23, 1985: a man in a dark ski mask stole Cynthia Tankersley's purse and shot her in the head; a male assailant shot Anna Richman, whose purse was missing from the scene; and a man in a ski mask accosted Tammy Tvedt and Frank Hensley as they exited their car and shot them when they did not comply with his demand for money. Richman died from her wounds, but the other victims survived. Three ballistics experts testified that shell casings and bullets recovered from each of the Oklahoma crimes were fired from the same gun used to kill Ellerman and Wells in San Diego.

Waldon presented several witnesses who testified about his good character and humanitarian work promoting Poliespo, Esperanto, and Native American activities. He also presented a witness who explained the Esperanto language and its utilities, and a correctional expert who testified that if sentenced to life without parole, Waldon would be able to write and engage in religious activities and would likely adjust well to prison.

## II. WALDON'S SELF-REPRESENTATION

Waldon contends the trial judge erred when he granted Waldon's request to represent himself after a different judge had previously denied the request. We agree.

Before the start of his criminal trial, Waldon moved to exercise his right of self-representation under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). Judge Zumwalt heard the motion and denied it, finding that Waldon had a mental disorder that prevented him from rationally perceiving his circumstances, appreciating the risks and consequences of self-representation, and appropriately formulating and presenting a defense. A little over a year later, Waldon filed a second *Faretta* motion before a different judge, Judge Boyle. Judge Boyle granted the motion without considering Judge Zumwalt's *Faretta* denial or the evidence on which it was based. As we explain, this was an abuse of discretion that deprived Waldon of the assistance of counsel throughout his criminal trial.

### A. Background

Before trial, Waldon submitted a request to the court to dismiss his lawyers and represent himself. Judge Zumwalt ordered a psychiatric examination to assess Waldon's capacity to waive counsel. The psychiatrist who conducted the examination, Dr. Kalish, concluded that Waldon did not appreciate the ramifications of waiving counsel and likely had a delusional thought disorder. After Dr. Kalish testified that he also doubted Waldon's ability to rationally understand the proceedings or assist counsel, Judge Zumwalt suspended the criminal proceedings to determine Waldon's competence to stand trial. A different judge presided over the competency trial.

7

### 1. *Competency trial*

Defense counsel presented evidence that Waldon was not competent to stand trial. Two military doctors described Waldon's treatment for severe depression with psychotic features while he was in the Navy. A battery of psychological tests from that time reflected severe symptoms and treating staff concluded that Waldon was very ill; he was later discharged from service. Dr. Kalish testified that Waldon had a mood disorder, paranoia, and a thought disorder that impaired his ability to relate to his attorney and to think clearly and assess the proceedings against him. Waldon's mental illness also caused him to focus on issues unrelated or only marginally related to his trial; although Waldon's stated goal was to be found competent, his behavior reflected incompetence, a factor indicating his impairment was genuine.

Two experts testified for the prosecution, disputing the significance of Waldon's condition in the military and disagreeing with the conclusions of the defense experts. The prosecution experts concluded that Waldon was competent to stand trial and was likely feigning mental illness. The defense presented testimony from another expert to rebut the prosecution experts, but the jury found Waldon competent.

Defense counsel filed a petition for writ of mandate to challenge the competency verdict. After the Court of Appeal denied the petition, counsel filed a petition for review in our court, raising several claims of error and seeking a new competency trial. We granted review and ordered the Court of Appeal to issue an alternative writ to consider the claims.

### 2. *First* Faretta *hearing*

In February 1988, while the competency petition was

pending, the parties returned to Judge Zumwalt's courtroom to continue addressing Waldon's motion to dismiss counsel and represent himself — the original *Faretta* motion that was interrupted when Judge Zumwalt declared a doubt about Waldon's competence to stand trial. Judge Zumwalt appointed Ben Sanchez to serve as Waldon's advisory counsel, and she agreed to allow Waldon to call witnesses in support of his motion and to question the experts defense counsel presented to show that Waldon lacked the mental capacity to waive counsel.

Dr. Kalish, the court's expert, offered examples of Waldon's inability to understand the nature of the proceedings and gave his opinion that Waldon had a psychotic disorder and was not competent to waive counsel. On cross-examination by the prosecutor, Dr. Kalish explained that Waldon's intelligence was normal but his paranoia affected his ability to decide whether to waive counsel: "[I]t clouds and distorts his perceptions" and leaves him "so inundated by neurotic and other input" that he is not able to make "decisions clearly, reasoned, with eyes wide open." Dr. Kalish also noted that Waldon expressed contradictory goals simultaneously, which was indicative "of mental disease, of the confusion, the lack of appreciation of what's going on."

Asked more specifically about Waldon's understanding of self-representation, Dr. Kalish said that he was particularly concerned that Waldon did not understand the responsibilities of self-representation and did not "appreciate that distinction between the advisory attorney and the attorney representing him." Dr. Kalish explained that normal intelligence can co-exist with mental illness and dysfunction; he observed that Waldon was generally able to portray a "veneer" of competence but

lacked any meaningful understanding of his circumstances and had no insight into his mental impairment. Dr. Kalish concluded, based on his conversations with Waldon, that Waldon was not capable of mounting a rational, coherent defense. These factors were relevant to whether Waldon was able to make a reasoned decision to waive counsel; Dr. Kalish stated that the fact that "he may not do a good job is not the issue here, as I understand it."

Waldon sought to call lay witnesses who knew him before he was arrested and an expert who had been consulting with the defense, Dr. Koshkarian. Waldon explained that Dr. Koshkarian "has examined me extensively in the jail, and I have answered his numerous questions. He is the only psychiatrist with whom I have cooperated." The court allowed Waldon to present five lay witnesses who testified about their background and interactions with Waldon. Answering identical questions from Waldon, four of the lay witnesses testified that they believed Waldon was mentally competent and was able to "knowingly, voluntarily, and intelligently" waive counsel. The fifth, Joan Williams, testified that Waldon appeared competent "[f]rom what I've seen today."

Gloria Fern Renas, one of the five lay witnesses, taught a community college class that Waldon was attending just before his arrest. She testified that it was difficult to know about Waldon's abilities beyond the scope of the classroom but nonetheless believed he was able to waive counsel. Joan Williams taught Waldon in a section related to Renas's course. She testified that Waldon was never "rambling or incoherent," was not overly loud or boisterous, and was not disruptive in class.

Bernice Garrett met Waldon at a meeting of the Esperanto Association, and he joined her Toastmasters club, a group that taught public speaking. She had some phone contact with Waldon after his arrest and visited him once in jail. Garrett said that Waldon told her he was willing to die for the principle of defending himself. Responding to questioning from the court, Garrett testified that she felt Waldon could defend himself because he was intelligent, able to read and understand legal material, and able to understand and follow the advice of counsel.

George Max Brande knew Waldon from the Toastmasters club and regularly spoke to him on the phone after his arrest. Brande taught English as a second language and considered language competence indicative of mental competence. He noted that Waldon was a competent English and Esperanto speaker. Brande's opinion that Waldon was able to represent himself was based on Waldon's ability to speak rationally and to handle "his own affairs." Brande stated that Waldon felt his "individual rights" were more important than "life itself." He believed that Waldon's life would not be jeopardized by self-representation because "he will always have the right to have co-counsel."

William Bernard Schwartz knew Waldon from an Esperanto club. They had seen each other at meetings several years prior to Waldon's arrest, and Schwartz had some phone contact with Waldon after his arrest and visited him once in jail. The court acknowledged that there was "very little foundation" for Schwartz's opinion but rejected defense counsel's request to strike the testimony.

Waldon decided not to present testimony from Dr.

Koshkarian and stated his intent to call M.A. Rose, a psychologist from Oklahoma instead. Defense counsel noted that Rose was Waldon's sister and questioned her professional credentials. Waldon ultimately did not call Rose or additional witnesses.

Defense counsel called Dr. Koshkarian to testify. Counsel had retained Dr. Koshkarian to address mental state defenses to the criminal charges and potential penalty phase mitigation. When Dr. Koshkarian talked to Waldon about self-representation, Waldon believed that he would have counsel to advise him and he would not have to speak in court. Dr. Koshkarian testified that Waldon's judgment was too impaired to adequately prepare a proper defense. His opinion was based on 10 or more hours of meeting with Waldon in eight visits, including two in the past week, and his review of police reports and Waldon's psychiatric records. On cross-examination by Waldon, Dr. Koshkarian stated that in "the strict intellectual sense," if presented with a list of the implications, Waldon knew what it meant to waive counsel. Because Waldon was not capable of preparing a defense, however, Dr. Koshkarian found that Waldon was not able to make a knowing and intelligent decision to waive counsel with a full understanding of the implications. Dr. Koshkarian testified that Waldon was "not in any way aware of issues" related to his own defense. When cross-examining Dr. Koshkarian, Waldon clarified that when he said that he would not have to speak in court, he was talking about representing himself "with full counsel."

Defense counsel also called a clinical psychologist, Dr. Di Francesca, to testify. Counsel had retained Dr. Di Francesca to work with the defense and administer psychological tests to

Waldon. Dr. Di Francesca interviewed Waldon several times and, based on those interactions and her review of other expert testimony, Dr. Di Francesca testified that Waldon was not competent to waive counsel or represent himself. Dr. Di Francesca acknowledged that some of Waldon's behaviors were manipulative and that there was likely a "component of malingering." Taking account of those factors, Dr. Di Francesca nonetheless concluded that Waldon had a mental disorder and was "deeply disturbed." Waldon was unable to think clearly about his criminal case or concentrate on anything related to it; instead, he focused on "nonrelevant side issues." It was unclear to Dr. Di Francesca whether Waldon even understood the charges against him; he told her he understood them but did not articulate what they were.

The prosecution and defense also stipulated to Judge Zumwalt's consideration of all the expert testimony from the competency trial.

In a March 1988 ruling, Judge Zumwalt denied Waldon's *Faretta* request. She found that Waldon had a mental disorder that impaired his free will "to such a degree that his decision to request to represent himself is not voluntary." The judge found that Waldon "does not rationally perceive his situation," that his mental disorder affected his "powers of reason, judgment and communication," and that Waldon did not "realize the probable risks and consequences of his action. . . . While Waldon has the cognitive ability to understand the proceedings, he cannot formulate and present his defense with an appropriate awareness of all ramifications."

13

### 3. *Removal of trial counsel*

After denying Waldon's *Faretta* motion, Judge Zumwalt also denied defense counsel's motion to be relieved from Waldon's case, finding that counsel's representation was not impaired by potential conflicts. In a petition for writ of mandate, counsel sought to be relieved as trial counsel but to continue representing Waldon on challenges to the competency trial that were still pending in the Court of Appeal.

In September 1988, the Court of Appeal granted counsel's request to be relieved as trial counsel and denied her request to continue representing Waldon in the competency proceedings. The appellate court stated that replacement trial counsel would be "free to raise any existing or new argument he or she deems appropriate in the mental health proceeding." The appellate court also noted that although "section 1368 subdivision (c) would deprive the trial court of jurisdiction to *prosecute* Waldon" until his competence was "finally determined," it did not prohibit the trial court from relieving Waldon's attorney and "appointing substitute counsel to assure Waldon's adequate defense." The Court of Appeal directed the superior court "to appoint substitute lead counsel forthwith. Substitute counsel shall have thirty days following appointment to consult with his or her client and to file whatever additional briefing he or she deems necessary in [the section 1368] writ proceedings . . . pending before this court."

Once the remittitur issued, the trial judge sent the parties to the master calendar court to carry out the change in representation. Although the court relieved trial counsel, the appointment of replacement counsel was delayed several times because the master calendar judge recused himself, the case was

assigned to two other judges, and the first appointed counsel declared a conflict and inability to work with Waldon.

### 4. *Interim filings and proceedings*

In a December 1988 petition filed in propria persona, Waldon asked to represent himself "with full assistance of counsel" required to "obey" him. He stated that if his request were denied, he would seek to waive counsel and represent himself. In the nearly 100-page petition, Waldon complained of the "rampant sexual promiscuity" of his "omnivaginal" former trial counsel, alleging that counsel engaged in domineering sexual practices; sexual relations with inmates, judges, and prosecutors; drug dealing and Mafia involvement; and efforts to have a hit man kill him, among other menacing, unlawful, and sexually motivated conduct. Waldon claimed that counsel was "a brilliant and extremely dominating man, trapped in a woman's body," and that she tried to seduce him out of self-representation by exposing her breasts to him.

In the petition, Waldon explained that his "defense strategy" involved representing himself and insisting on a speedy trial that would take the prosecutor by surprise. Waldon stated that "to cooperate with any attorney at trial with the petitioner not in 'pro per' status would be in violation of the petitioner's religion." After reviewing the petition, the Court of Appeal ordered that any claims not mooted by its September 1988 ruling could be presented to the superior court "by new counsel appointed pursuant to our decision."

During an appearance before Judge Malkus, the newly-assigned trial judge, advisory counsel Sanchez stated that Waldon wanted to renew his *Faretta* motion and that the appellate court order indicated that Waldon should present it in

the superior court through his new trial attorney. Judge Malkus set a hearing for the motion later in the month.

In February 1989, Waldon again appeared in court for the appointment of counsel. Mark Wolf was present and prepared to accept appointment as lead trial counsel for all purposes. Alan Bloom was also present. Bloom stated that he was not willing to take on full representation but suggested that he could serve a limited role of helping Waldon pursue self-representation. Advisory attorney Sanchez informed the court that Judge Malkus had agreed to reconsider Waldon's *Faretta* motion and had set it for hearing. The prosecutor interjected to explain that the case was under an order from the Court of Appeal to appoint trial counsel for all purposes.

The court ordered Sanchez to continue as advisory counsel and appointed Bloom for the limited purpose of assisting Sanchez with Waldon's second *Faretta* motion. The court did not appoint Wolf, explaining that Wolf would only be needed if Waldon's *Faretta* motion were unsuccessful. The prosecutor emphasized the pending appellate review of the competency trial, stating that the court needed to resolve Waldon's competency before addressing Waldon's request to represent himself. Rejecting the prosecutor's argument, the court reasoned that if Waldon's *Faretta* motion were successful, he could act as his own counsel in deciding how to address the pending competency challenges.

In subsequent proceedings, the parties made clear the limited role of attorneys Bloom and Sanchez. Bloom explained to one judge that he was "appearing for the specialized purpose" of assisting Waldon "so that he may be named his own counsel." After hearing Bloom's limited role, a different judge remarked,

"I don't understand, Mr. Bloom, for the purposes of the record, your presence here. Who represents Mr. Waldon?" Before a motions judge who also expressed confusion about Waldon's representation, the prosecutor stated that Sanchez and Bloom had been appointed to help Waldon achieve propria persona status; there was no disagreement with the prosecutor's statement that Waldon "at this point stands unrepresented in the matter."

### 5. *Second* Faretta *hearing*

Waldon filed another *Faretta* motion in June 1989, making two distinct requests. The first was "a request to proceed 'in propria persona' with full assistance of two counsel with the restriction that counsel be prohibited from acting or speaking against the wishes of the defendant and that counsel be required to follow the directions of the defendant." The second request, to be addressed only if the first were denied, was for Waldon to be named "lead counsel" with the appointment of "second chair counsel" who would "follow his direction and assist him in his case." The accompanying written waiver acknowledged Waldon's rights to the assistance of counsel, speedy trial, and other trial rights; it also listed the responsibilities of a "lead attorney," such as selecting a jury and questioning witnesses, and it indicated that "I understand that if I am named lead counsel I will not have the benefit of a lead counsel to do all the forementioned things."

The June 1989 *Faretta* motion was initially assigned to Judge Langford, who denied the first part of Waldon's request, the appointment of counsel who would take direction from Waldon. Turning to the second part of Waldon's request, to represent himself with the assistance of "second counsel," the

judge observed that it was a problem to let Waldon make a *Faretta* request when there was still a pending appeal regarding his competency. At the urging of advisory counsel Bloom, Judge Langford nonetheless agreed to proceed. Informed that Waldon sought to present witnesses to support his motion, the judge ordered witness statements to be submitted in writing and continued the hearing.

The case was later assigned for trial to Judge Boyle, who took up the *Faretta* hearing where Judge Langford left off. Appearing before Judge Boyle for the first time, Bloom explained that he was not appearing as "full-purpose counsel, but just for the purpose of assisting [Waldon] in his efforts to become pro per." The first issue Waldon raised was a peremptory challenge against Judge Boyle and a challenge for cause. Denying the challenge, the judge observed that there was "some 1368 history" that was still pending. Bloom responded that the competency issues were "very remotely" pending in "some sorts of writs" but were not currently before the trial court.

Waldon next sought to have Judge Boyle address problems Waldon was having obtaining his prior defense counsel's case file. In response, the prosecutor summarized the problem in transferring the case materials: prior counsel had been relieved; there was no lead counsel appointed to whom prior counsel could send her file; Bloom was "only an advisory attorney for purposes of pro per"; and Waldon could not receive the file because he was not yet representing himself. Judge Boyle responded that although Bloom and Sanchez had been appointed for a limited purpose, "it is for a limited purpose in the sense of mission. As far as I am concerned, both of you are the attorneys for the

defendant completely and 100 percent at this point in time and would certainly be a correct repository of any files or information if you were to request it the next time."

As the parties went on to discuss scheduling, the prosecutor noted that there was a "voluminous" case file. He explained that there had already been one *Faretta* motion and that the court might want to review the proceedings related to it. Bloom responded that Waldon was requesting "that the Court limit its review to the pending motion. The review of prior materials, he thinks, we believe, could possibly be prejudicial." The court asked Bloom if he joined in Waldon's request; after Bloom's affirmative response, the court granted the request without discussion. In a later hearing to discuss the status of the *Faretta* motion, Judge Boyle stated, "I have — I hate to say this on the record, but — intentionally kept myself ignorant of the history of this case. So don't assume that I have been following this case along and understand what has happened before, because I don't know anything about what's happened before."

Waldon ultimately submitted affidavits from several lay witnesses who attested to Waldon's competence and their belief that he should be allowed to waive his right to counsel. Some of the witnesses met Waldon at Esperanto meetings or conferences in 1984 and 1985, and they described interacting with him during one or two such events; others knew Waldon when he was taking Esperanto courses in 1983 and 1984; and one witness met Waldon in 1984 through his younger sister. Bernice Garrett and Max Brande, who testified in the first *Faretta* hearing, again declared their belief that Waldon was competent to waive

his right to counsel. They both noted that Waldon said he was willing to die for the principle of defending himself.

Waldon also submitted reports from two experts: Dr. Giraldi, a psychiatrist, and Dr. Weinstein, a clinical psychologist. Neither doctor referred to reviewing case or background material, and both doctors referred to Waldon as "Steven Midas," the alias Waldon was using when he was arrested.

Dr. Giraldi performed a mental status examination of Waldon in June 1989. Waldon would only answer questions related to the past year and claimed that he was in good physical and mental health. Dr. Giraldi stated that Waldon did not appear to have a thought disorder or psychosis, concluded that Waldon was competent to waive counsel, and noted that "Mr. Midas stated he felt he understood his attorney and the nature of his case."

Dr. Weinstein met with Waldon in April 1989 and administered portions of an intelligence test and a test to assess brain damage. Dr. Weinstein acknowledged that Waldon was only willing to disclose information he felt was relevant to his capacity to defend himself; Waldon had not revealed, for example, the reason he was in custody or the crimes he was facing. Dr. Weinstein reported that Waldon's intelligence was above average and found no indication of psychosis or brain damage that would prevent Waldon from representing himself. Dr. Weinstein described Waldon as "an intelligent man who is clearly aware of the consequences of his choice." He stated that Waldon "expressed a clear awareness that even though his choice to defend himself might not be the best possible alternative, it is his preference, ultimately stating 'I've always

been like that . . . if you want something done right, do it yourself.' "

At the hearing on Waldon's second *Faretta* motion, the trial judge characterized Waldon's affidavits as presenting "in summary fashion, a testament to [Waldon's] intelligence and competence." The judge noted that it was "a remarkable group of documents by people of various professions in support of Mr. Waldon." The judge then advised Waldon of some of the disadvantages of self-representation: Waldon's ignorance of the law or procedural difficulties would not be an excuse for delay; he would be subject to the same rules as any lawyer; he would be required to cooperate with the court and accept its rulings; and he would be facing prosecutors who were far more experienced in the law. The judge stated, "It's very clear — everybody in the business knows it — that self-representation is consistently, if not always, a detriment to the defendant's preparation of his own defense. [¶] Do you understand that that's our opinion Mr. Waldon?" To each of the court's admonitions, Waldon responded, "Yes, your Honor." The judge then noted, "There is no question in this Court's mind of the defendant's ability to read and write, listen, be polite, and cooperate if he chooses to do so." After a brief discussion to ensure that Waldon's June 1989 waiver was on file, the judge granted Waldon's request to represent himself.

### B. Discussion

#### 1. Waiver

The Attorney General contends that Waldon waived his claim by inviting any error in the reconsideration of Judge Zumwalt's *Faretta* denial. " 'The doctrine of invited error is designed to prevent an accused from gaining a reversal on

appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.) To evaluate the question of invited error, we first consider the nature of Waldon's representation in the second *Faretta* proceeding.

As noted, Sanchez served as advisory counsel, and the trial court later appointed Bloom to assist him. Both attorneys made clear that their role was to carry out Waldon's wishes as he pursued self-representation. The Attorney General suggests that because the attorneys made appearances for Waldon and filed motions on his behalf, they represented Waldon in his renewed *Faretta* motion. But attorneys serving in an advisory capacity "do not 'represent' the defendant." (*People v. Lightsey* (2012) 54 Cal.4th 668, 692.) Our precedent has "loosely used" a variety of terms to describe the assistance counsel may provide to a defendant who is directing the defense. (*People v. Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14.) In some circumstances, the attorney advises the defendant and does not participate in the proceedings; in others, the "attorney shares responsibilities with the defendant and actively participates in both the preparation of the defense case and its presentation to a degree acceptable to both the defendant and the attorney and permitted by the court." (*People v. Moore* (2011) 51 Cal.4th 1104, 1119, fn. 7.) Ultimately, however, "there are only two basic categories of representation": one in which the defendant is represented by counsel who "is at all times in charge of the case" and one in which the defendant "assumes primary control" of the defense. (*Hamilton*, at p. 1164, fn. 14.) Tactical decisions to invite error

cannot be assigned to Sanchez and Bloom when their role was to raise issues and requests at Waldon's direction. In other words, Sanchez and Bloom were not in charge of the second *Faretta* motion; Waldon was. Without an attorney appointed for all purposes, there was no counsel to ensure, for example, that pending claims of error regarding Waldon's competence to stand trial were fairly resolved before any reconsideration of his *Faretta* motion.

The question then becomes whether we attribute invited error to Waldon's efforts, while his competence was still in question, to have the trial court disregard the prior *Faretta* denial. Before Waldon's second *Faretta* motion, we had directed the Court of Appeal to issue an alternative writ regarding errors in Waldon's competency trial. The issuance of our order "necessarily indicated that [defendant] had made a prima facie showing of [error], or a possible [error]." (*Coy v. Superior Court* (1962) 58 Cal.2d 210, 221; see also *Gomez v. Superior Court* (2012) 54 Cal.4th 293, 301.) In response to the alternative writ, the trial court was required to provide Waldon with a new competency trial or to show cause why a new trial was not warranted. (See Code Civ. Proc., § 1087.) An additional order from the Court of Appeal mandated the appointment of counsel for all purposes to address the pending competency issues. None of those actions had taken place at the time Waldon pursued his second *Faretta* motion and urged the trial court to ignore the prior competency and *Faretta* proceedings. Defendants do not waive a claim of error when they have been permitted to control the defense while the question of their competence is still pending. (*People v. Lightsey*, *supra*, 54 Cal.4th at p. 696.) When the " 'evidence indicates that the defendant may be [mentally ill]

it should be assumed that he is unable to act in his own best interests.' " (*Id.* at p. 697.)

Further, it is questionable whether waiver principles apply to a court's inquiry into a defendant's knowing and voluntary waiver of the right to counsel. (Cf. *People v. Palmer* (2013) 58 Cal.4th 110, 116 [it is inappropriate to apply waiver and forfeiture principles to a requirement whose purpose is to ensure that constitutional standards of voluntariness and intelligence are met].) Despite Waldon urging the trial court to ignore the prior competency and *Faretta* proceedings, the court had a duty to protect Waldon's right to counsel and to "satisfy itself that the waiver of his constitutional rights [was] knowing and voluntary." (*Godinez v. Moran* (1993) 509 U.S. 389, 400 (*Moran*); see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1069 [" 'the federal Constitution requires assiduous protection of the right to counsel' "].) "This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." (*Johnson v. Zerbst* (1938) 304 U.S. 458, 465.)

In sum, requests that Waldon made when his competence was in question, when he did not have counsel appointed to protect his interests, and when the trial court was obligated to ensure his knowing and voluntary waiver of counsel, could not have waived and did not waive his claim that the trial court erred in overturning Judge Zumwalt's *Faretta* denial.

### 2. *Authority to reconsider the* Faretta *denial*

A trial judge ordinarily may reconsider his or her own " 'prejudgment' " rulings. (*People v. Konow* (2004) 32 Cal.4th 995, 1020 (*Konow*).) Code of Civil Procedure section 128, subdivision (a)(8) authorizes a court to "amend and control its

24

process and orders so as to make them conform to law and justice." This provision applies to criminal cases as well. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1205.) There are limits, however, on the authority of one superior court judge to set aside the order of another judge of the same court. "[U]nder article VI, section 4, of the California Constitution, 'one [judge or] department of the superior court cannot enjoin, restrain, or otherwise interfere with the judicial act of another [judge or] department of the superior court.' " (*Konow*, at p. 1019.) This rule prevents a trial court judge from acting as a " 'one-judge appellate court' over another judge." (*Id.* at p. 1021.) There are some exceptions (see *Konow*, at p. 1021; *People v. Mattson* (1990) 50 Cal.3d 826, 849), but none apply here.

Citing *People v. Riva* (2003) 112 Cal.App.4th 981, 993, the Attorney General contends the trial court properly considered Waldon's second *Faretta* motion because of a change in circumstances. The court in *Riva* held that pretrial rulings on the admissibility of evidence could be reviewed by another judge following a mistrial if there was a "highly persuasive reason for doing so." (*Riva*, at p. 992.) Among the factors the *Riva* court identified as relevant to reconsideration was "whether there has been a change in circumstances since the previous order was made." (*Id.* at p. 993, fn. omitted.) Authority for this factor included, by way of analogy, Code of Civil Procedure section 1008, subdivision (b), which provides for reconsideration "upon new or different facts, circumstances, or law." (See *Riva*, at p. 993, fn. 33.)

According to the Attorney General, the change in circumstances justifying reconsideration here was the Court of Appeal issuing orders that (1) relieved trial counsel and (2)

stated that other issues regarding representation should be addressed in the trial court by new counsel appointed for all purposes. These orders do not represent a relevant change in circumstances because they had no bearing on the issue to be reconsidered — whether Waldon was competent to validly waive his right to counsel and represent himself. Moreover, when Waldon presented his second *Faretta* request, he did not claim there was any change in circumstances; he simply asked Judge Boyle to ignore the prior proceedings.

Even if we assume that a second judge could exercise discretion to reconsider the denial of Waldon's *Faretta* motion under some circumstances, we need not decide the precise standard governing that authority, whether by analogy to Code of Civil Procedure section 1008 or otherwise. Judge Boyle knew that a prior *Faretta* ruling by another judge posed a conflict with his ruling, but he did not consider the basis of the prior decision and ignored the underlying record. It is sufficient for purposes of this case to state the obvious: When a trial court exercises its authority to reconsider another judge's ruling, the trial court must, at minimum, consider the basis for the prior ruling. (See *Konow*, *supra*, 32 Cal.4th at p. 1019 [" ' " 'An order made in one department during the progress of a cause can neither be ignored nor overlooked in another department.' " ' "].)

Judge Boyle abused his discretion by overturning Judge Zumwalt's *Faretta* denial while intentionally ignoring her findings and the bases for her decision, and by ignoring relevant evidence, including testimony from three mental health experts that caused Judge Zumwalt to conclude that Waldon was not competent to validly waive counsel or represent himself. To overturn the *Faretta* denial in this manner — without regard for

26

key facts, findings, and legal principles — was "arbitrary or irrational." (*In re White* (2020) 9 Cal.5th 455, 470.) Waldon claims that the trial court's arbitrary reversal also violates due process, but we do not reach that constitutional question. (See *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1102 ["we avoid resolving constitutional questions if the issue may be resolved on narrower grounds"].)

### 3. *Effect of the error*

The Attorney General asserts that the decision to overturn Judge Zumwalt's *Faretta* denial was harmless because it was based on Waldon's knowing, intelligent, and voluntary waiver of counsel. Even if we were to assume that a proper *Faretta* hearing could remedy the error here, the record does not support the assertion that Judge Boyle conducted such a hearing.

A two-part inquiry determines whether a defendant may waive the right to counsel: (1) The defendant must be competent to stand trial, and (2) the trial court must "satisfy itself" that the waiver of "constitutional rights is knowing and voluntary." (*Moran*, *supra*, 509 U.S. at pp. 400–401.) In *Moran*, the high court explained that "the purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." (*Id.* at p. 401, fn. 12; accord, *People v. Koontz*, *supra*, 27 Cal.4th at pp. 1069–1070.) When there is reason to doubt a defendant's mental capacity to waive counsel, the court's determination should be made after a careful inquiry into the defendant's competence, including consideration of psychiatric evidence. (*People v. Wycoff* (2021) 12 Cal.5th 58, 90; *People v. Teron* (1978) 23 Cal.3d 103, 113–114.)

The Attorney General argues that nothing in the record suggested that Waldon was mentally incapable of understanding the rights he asked to waive. We are not persuaded. Dr. Kalish testified that Waldon was not able to make rational decisions or focus on coherent objectives because he was inundated with paranoid thoughts. Drs. Kalish, Di Francesca, and Koshkarian each testified that Waldon was unable to contemplate potential defenses or the implications of proceeding without counsel. Expert reports that found Waldon competent to waive counsel did not address the contrary findings or resolve them in any way. At the very least, these conflicting expert reports warranted further inquiry into Waldon's capacity to appreciate the risks of waiving his right to counsel.

The Attorney General contends that reports and testimony from Drs. Kalish, Di Francesca, and Koshkarian had limited relevance because "[m]ore than two years had passed since the earlier psychological evaluations, and Waldon had refused to cooperate with the appointed evaluators." But Waldon did cooperate with each of the experts, particularly with Dr. Koshkarian, who met with Waldon several times in 1987 and twice in March 1988. The record does not show that this evidence lacked relevance in 1989, when the trial court considered Waldon's second *Faretta* motion. At any rate, the trial judge could not consider the relevance of prior evaluations because he did not look at them or even know they existed.

The scope of a trial court's inquiry into a defendant's ability to validly waive counsel "depends on the particular facts and circumstances of the case." (*People v. Burgener* (2009) 46 Cal.4th 231, 242.) In *People v. Taylor* (2009) 47 Cal.4th 850, as

here, a judge initially denied the defendant's *Faretta* request, finding that he was not competent to waive counsel. (*Taylor*, at p. 859.) After competency proceedings and a determination that the defendant was competent to stand trial, a different judge granted the defendant's renewed *Faretta* request, considering the previous ruling, expert reports, and an extended colloquy with the defendant. (*Taylor*, at pp. 878–879.) Finding that the record supported the ruling, we noted that the trial court "elaborated at length" on the disadvantages of self-representation, considered particular difficulties the defendant might have, such as presenting mitigation evidence, and reached a conclusion that did not contradict the expert findings. (*Id.* at p. 879.) Furthermore, the defendant "did not simply reply to the court passively or monosyllabically" but engaged with the court, asked questions, and demonstrated his understanding of the risks and consequences of his decision. (*Id.* at p. 878.)

Here, the reasons Waldon gave for wanting to represent himself offered no indication that he "actually" appreciated the "significance and consequences" of that decision. (*Moran*, *supra*, 509 U.S. at p. 401, fn. 12.) He explained in a public filing that his trial strategy consisted of surprising the prosecutor by insisting on a speedy trial; he said he needed to bring criminal charges against his former trial counsel; he told others he was prepared to die for the principle of self-representation; he claimed that the assistance of counsel violated his religion. Further, Waldon's behavior — including his preoccupation with alleged conspiracies and wrongdoing unrelated to the criminal trial, and his inability or unwillingness to focus on potential defenses — did not signal an appreciation of the dangers and disadvantages he faced.

Notably, three experts who examined Waldon and reviewed background and case material testified about Waldon's mental impairment and inability to grasp the significance of waiving counsel. Although two new experts concluded that Waldon was competent to waive counsel, both acknowledged that Waldon limited the information he was willing to provide, and neither doctor considered the prior expert opinions, Waldon's psychiatric history and filings in propria persona, or other case information. (Cf. *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1048 [court could properly discount expert opinion regarding defendant's competence when the expert did not consider the defendant's psychiatric history and filings in propria persona and did not address contrary opinions and facts presented by other experts].)

Despite significant questions about Waldon's mental capacity, and unlike the extended colloquy in *Taylor*, Judge Boyle spoke only briefly to Waldon, comprising just two pages of transcript. In response to standard advisements — that his propria persona status would not be an excuse for delay, that he would be subject to the same rules as any lawyer, that opposing counsel was more experienced, and that self-representation is usually detrimental to preparing a defense — Waldon's only response was "Yes, your Honor." Then, without reviewing any portion of the record, the judge granted Waldon's *Faretta* request, stating, "There is no question in this Court's mind of the defendant's ability to read and write, listen, be polite, and cooperate if he chooses to do so." Given the circumstances we have recounted, Judge Boyle's inquiry was "plainly insufficient" to establish Waldon's "understanding of the dangers and disadvantages of self-representation" and his knowing and

voluntary waiver of the right to the assistance of counsel. (*People v. Burgener, supra,* 46 Cal.4th at pp. 241–242.)

By overturning Judge Zumwalt's *Faretta* denial, the trial court deprived Waldon of two distinct protections afforded by her ruling: (1) protection of Waldon's constitutional right to counsel after finding that Waldon had a mental disorder that prevented him from understanding the significance and consequences of waiving that right (see *People v. Koontz, supra,* 27 Cal.4th at p. 1069); and (2) protection of Waldon's right to a fair trial after a finding that he was unable to present a defense because of his mental impairment, a basis for denying self-representation within the judge's discretion (*Indiana v. Edwards* (2008) 554 U.S. 164, 176–177; *People v. Johnson* (2012) 53 Cal.4th 519, 533; *People v. Taylor, supra,* 47 Cal.4th at p. 878). Judge Boyle did not establish Waldon's valid waiver of counsel before overturning Judge Zumwalt's ruling, nor did he consider or address Waldon's competence to present a defense. The proceeding on Waldon's second *Faretta* request therefore did not remedy the deprivation of counsel as the Attorney General suggests.

The effect of the trial court's error, the "total deprivation of the right to counsel at trial," is among the errors "which defy analysis by 'harmless-error' standards." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309.) "Whether a violation of state law or federal constitutional law, structural error results in per se reversal." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196; see also *People v. Anzalone* (2013) 56 Cal.4th 545, 554.) Because this error requires reversal of the judgment, we do not consider Waldon's remaining claims of error.

## CONCLUSION

We reverse the judgment in its entirety and remand the case to the trial court for further proceedings.


**LIU, J.**


**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**CANTIL-SAKAUYE, J.**[*]

---

[*]    Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Waldon

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S025520
**Date Filed:** January 23, 2023

_____

**Court:**  Superior
**County:**  San Diego
**Judge:**  David M. Gill

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, Karen Hamilton and Hassan Gorguinpour, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Dane R. Gillette, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorneys General, Holly D. Wilkens, Arlene A. Sevidal, Kristine A. Gutierrez and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Hassan Gorguinpour
Deputy State Public Defender
770 L Street, Suite 1000
Sacramento, CA 95814
(916) 322-2676

Collette C. Cavalier
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9201